UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 AUG 11 PM 1:17

CLERK

BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| LINDA LUXENBERG and | ) | |
| KELCEY LUXENBERG, as Guardians | ) | |
| and next best friends of JOHN DOE; | ) | |
| LINDA LUXENBERG, for herself; and | ) | |
| JOHN DOE | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-00188 |
| | ) | |
| VERMONT DEPARTMENT OF | ) | |
| DISABILITIES, AGING AND | ) | |
| INDEPENDENT LIVING; MONICA | ) | |
| WHITE, in her official and individual | ) | |
| capacities; JENNIFER GARABEDIAN, | ) | |
| in her official and individual capacities; | ) | |
| WASHINGTON COUNTY MENTAL | ) | |
| HEALTH SERVICES INC.; MARY | ) | |
| MOULTON, in her official and individual | ) | |
| capacities, and LAMOILLE COUNTY | ) | |
| MENTAL HEALTH SERVICES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION TO AMEND THE COMPLAINT, GRANTING IN PART
AND DENYING IN PART DEFENDANT WCMHS'S MOTION TO DISMISS,
AND GRANTING IN PART AND DENYING IN PART DEFENDANT MARY
MOULTON'S PARTIAL MOTION TO DISMISS**
(Docs. 26, 27, 39)

Plaintiffs Linda Luxenberg and Kelcey Luxenberg, as guardians and next best
friends of John Doe, Linda Luxenberg individually, and John Doe ("Plaintiffs") bring this
action against Defendants Vermont Department of Disabilities, Aging and Independent
Living ("DAIL"); Monica White ("Commissioner White"), in her individual capacity and
her official capacity as the Commissioner of DAIL; Jennifer Garabedian ("Director
Garabedian"), in her individual capacity and her official capacity as the Director of

DAIL's Developmental Disabilities Services Division; Washington County Mental Health Services, Inc. ("WCMHS"); Mary Moulton, in her capacity as the Executive Director of WCHMS; and Lamoille County Mental Health Services, Inc. ("LCMHS") (collectively, "Defendants"). Plaintiffs seek declaratory and injunctive relief arising out of Defendants' alleged termination of mental health services for John Doe without the consent of Plaintiffs, failure to develop a transition plan of services for John Doe, and failure to provide funding for an appropriate placement for him.

Pending before the court is Plaintiffs' motion for leave to amend their Complaint. Also pending before the court are WCMHS's and Ms. Moulton's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) because the claims asserted in Counts I through V are not ripe; and Ms. Moulton's partial motion to dismiss all claims against her in her individual capacity pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted.

The Amended Complaint (the "AC") asserts eight causes of action: a procedural due process claim under the Fourteenth Amendment of the United States Constitution and Article 4 of the Vermont Constitution (Count I); a Medicaid Due Process claim under 42 U.S.C. § 1396a(a)(3) (Count II); a violation of the Rehabilitation Act, 29 U.S.C. § 701 (Count III); a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (Count IV); a violation of the Vermont Fair Housing and Public Accommodations Act ("VFHPA"), 9 V.S.A. § 4502 (Count V); a negligence claim (Count VI); a retaliation claim in violation of 18 V.S.A. § 8728(b) (Count VII); and a violation of John Doe's and Linda Luxenberg's right to free speech (Count VIII).

Plaintiffs assert that this court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367.

## I.    Procedural Background.

On April 18, 2023, the court heard oral argument on Ms. Moulton's and WCMHS's motions to dismiss and Plaintiffs' motion to amend, at which point it took those motions under advisement. The court denied as moot Plaintiffs' motion for a

2

preliminary injunction at the April 18, 2023 hearing. On May 2, 2023, Plaintiffs filed a second motion for a preliminary injunction. The court heard oral argument on the motion for a preliminary injunction on July 13, 2023, which was continued on August 11, 2023.

Plaintiffs are represented by James A. Valente, Esq., and Zachary D. Hozid, Esq. DAIL, Commissioner White, and Director Garabedian are represented by Edward M. Kenney, Esq. WCMHS, Ms. Moulton, and LCMHS are represented by Richard J. Windish, Esq. and Elizabeth A. Willhite, Esq.

## II.    Whether the Court Should Consider the AC in Adjudicating Defendants' Motion to Dismiss.

Plaintiffs request leave to amend their Complaint to add factual allegations pertaining to LCMHS, which was joined as a party after this action was filed, as well as additional allegations regarding other defendants and a new claim (Count VIII) for violation of Plaintiffs' First Amendment rights to free speech against Commissioner White (as Commissioner of DAIL), WCMHS, and Ms. Moulton. WCMHS and Ms. Moulton oppose Plaintiffs' request on the grounds that it is unnecessary to amend the Complaint to join LCHMS because LCHMS has already been joined as a defendant, Plaintiffs' First Amendment claim is futile because Ms. Moulton is immune from suit, Plaintiffs' claims are not ripe, Plaintiffs' request to amend is a dilatory tactic, and Plaintiffs seek injunctive relief which is no longer necessary.

Plaintiffs may only amend their complaint "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The court must "freely give leave when justice so requires[,]" *id.*, but "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "[T]he standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). Amendment is futile when there is a substantive problem with a cause of action that cannot be cured by better

3

pleading. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

WCMHS and Ms. Moulton have not demonstrated that amendment of Plaintiffs' Complaint would be prejudicial or dilatory. DAIL Defendants have already refiled their motion to dismiss in light of the proposed AC.

Due to the early stage of the proceedings and the lack of prejudice to Defendants, the court CONDITIONALLY GRANTS Plaintiffs leave to amend their Complaint (Doc. 39) and considers the AC in adjudicating the pending motions to dismiss, including whether futility requires denial of leave to amend. *See Alice Peck Day Mem. Hosp. v. Samuelson*, 2023 WL 4157434, at *1 (D. Vt. June 23, 2023) ("While the motions to dismiss were pending, Plaintiffs moved to amend their Complaint [and] . . . [t]his court granted Plaintiffs' motion . . . stating that it would consider the pending motions to dismiss in light of Plaintiffs' FAC."); *Wolfe v. Enochian BioSciences Denmark ApS*, 2022 WL 656747, at *2 (D. Vt. March 3, 2022) ("In order to further the 'just, speedy, and inexpensive determination' of this action, . . . the court GRANTS Plaintiffs' motion to amend and will consider Defendants' motions to dismiss in light of the Amended Complaint.") (quoting Fed. R. Civ. P. 1).

### III.   The AC's Factual Allegations.

John Doe is an adult under the guardianship of his mother, Linda Luxenberg, and sister, Kelcey Luxenberg, due to his diagnoses of autism spectrum disorder ("ASD") and Landau-Kleffner syndrome, which "substantially impair his sensory processing, verbal communication ability, and emotional and behavioral regulation to such an extent that he cannot function in the community without the assistance of staff and technological aids." (Doc. 39-2 at 1-2, ¶ 1.) He "has received disability services in Vermont for most of his life." *Id.* at 6, ¶ 27.

DAIL is a department within the Vermont Agency of Human Services (the "Vermont AHS"). Vermont's Developmental Disabilities Act (the "Act") requires that DAIL "'plan, coordinate, administer, monitor and evaluate' services for those in Vermont with developmental disabilities." *Id.* at 5, ¶ 19 (quoting 18 V.S.A. § 8723). DAIL provides funding to "Designated Agencies and Specialized Services Agencies to provide

4

direct care and support" and requires those agencies "to provide services to all eligible individuals in each of Vermont's [fourteen] counties[.] . . . Designated Agencies must provide services directly or contract with other providers or individuals to deliver support and services consistent with available funding, state and local System of Care Plans and state and federal guidelines." *Id.* at ¶¶ 23-24. DAIL's rules and procedures require that "local agencies collaboratively form Individual Support Agreements ('ISAs') with the individuals they serve, setting forth the specific obligations of the Designated Agency in connection with each disabled individual." *Id.* at 6, ¶ 25.

WCMHS is a non-profit organization in Vermont and is the Designed Agency for Washington County, where John Doe resides. "Accordingly, WCMHS is obligated to provide adequate services to him and his family which comport" with the Act. *Id.* at 6, ¶ 26.

In December 2017, Melmark New England, an organization providing developmental disability services and assessments ("Melmark"), evaluated John Doe to determine his service needs, assess his progress, and make recommendations. WCMHS and DAIL both had access to Melmark's evaluation, which concluded that John Doe had "significant communication and behavioral barriers" and "recommended that the structure of his programming be designed through consultation with experts in autism and severe behavioral challenges, and that [John] Doe's providers should manage the element causing many of his crises—transitions—by utilizing a visual schedule with carefully planned, developmentally appropriate options[.]" (Doc. 39-2 at 8-9, ¶ 43.)

John Doe previously lived in Waitsfield, Vermont, where he was assisted by Upper Valley Services, a Specialized Service Agency funded by DAIL. In May 2020, he experienced a crisis and was transported to Dartmouth-Hitchcock Medical Center ("DHMC"). Thereafter, he was unable to return to Waitsfield and stayed in DHMC's emergency department until a residential placement was arranged. A team, including DAIL and Commissioner White's predecessor, Commissioner Monica Hunt, developed a

residential placement for John Doe.[1] In August 2020, John Doe was moved to "a short-term crisis bed" owned and operated by the Vermont Crisis Intervention Network ("VCIN"). *Id.* at 7, ¶ 33. Seventy-two hours later, John Doe was rehospitalized at DHMC.

WCMHS and DAIL thereafter "decided to create a program in Marshfield, Vermont, which led WCMHS to purchase the single family house in which [John] Doe currently resides." *Id.* at 7, ¶ 38. DAIL supervises and funds the program, while WCMHS was responsible for day-to-day oversight and decision-making. John Doe's "care [was] based on a needs assessment by WCMHS finding his needs to be significant in most areas[] and a behavior support plan developed by WCMHS in August of 2020. Both were approved by DAIL, which allocated over $800,000 annually for each year to present for services to benefit [John] Doe[.]" *Id.* at 8, ¶ 41. John Doe has lived at the Marshfield residence, which was owned and operated by WCMHS, since September 2020. The home is equipped with technology which allowed WCMHS staff to monitor John Doe from a room that is inaccessible to him, except in John Doe's bedroom and bathroom. WCMHS also provided two staff members to assist John Doe.

After initiating the program in Marshfield, Plaintiffs allege that WCMHS "consulted with autism and behavioral specialists and communication specialists" but that Commissioner White terminated those contracts "without implementing the experts' recommendations." *Id.* at 9, ¶ 44. One of these terminated contracts was with expert autism consultant, Kate Panaccione, Ed.D., who was "under contract to serve [John] Doe pursuant to a stipulated court order in the guardianship matter in the Civil Division of the Vermont Superior Court." *Id.* at 9, ¶ 45. Plaintiffs allege that on May 15, 2021, Ms. Panaccione submitted "a report of abuse and neglect to DAIL based on her observations of the services provided to [John] Doe by WCMHS." (Doc. 39-2 at 9, ¶ 45.) In alleged retaliation, Commissioner White, who reviewed the report, terminated the contract.

---

[1] Plaintiffs allege, upon information and belief, that "[Commissioner] White attended meetings or has been briefed about ongoing issues related to the care and services for Plaintiff Doe since she became Commissioner of DAIL in 2021." (Doc. 39-2 at 7, ¶ 32.)

6

Plaintiffs allege that although a full calendar of events and appointments is part of John Doe's behavior support plan, WCMHS failed to arrange activities for him and his calendar is "mostly blank, even after repeated requests by Linda [Luxenberg] that WCMHS . . . take steps to fill [John] Doe's schedule." *Id.* at 9, ¶ 46. WCMHS also allegedly failed to provide John Doe with the tools he requires to communicate effectively with its staff. John Doe's "initial behavior support plan[,] . . . current support plan, and communication plan all recommend that communication should be in writing or visual[,]" but WCMHS and VCIN staff "often attempt[ed] to communicate with [John] Doe verbally, which impede[d] his ability to communicate and often frustrate[d] him." *Id.* at 10, ¶ 48.

Melmark conducted another evaluation of John Doe in August and September 2021 and concluded that his "ISA and behavior support plan were not being implemented." *Id.* at 10, ¶ 49. Melmark "noted failures by [John] Doe's staff to utilize nonverbal communication, the lack of an appropriate schedule, and consequential behavioral problems including deterioration of [John] Doe's ability to maintain basic hygiene, routine dysregulation, and troubling behaviors like spending the day pacing around the home." *Id.* Plaintiffs allege, upon information and belief, that the Melmark evaluation was reviewed by WCMHS, Ms. Moulton, Commissioner White, Director Garabedian, and other DAIL representatives. Despite Melmark's evaluation, Plaintiffs allege that neither WCMHS nor DAIL made changes to John Doe's program.

In January 2022, John Doe "experienced severe behavioral dysregulation[] during which he became physically aggressive" and was taken to the emergency department at Central Vermont Medical Center. *Id.* at 10, ¶ 51. He was cleared for discharge within twenty-four hours but "remained in the ED for approximately one week before WCMHS allowed him back to the Marshfield home" apparently "due to the lack of a safe place for him to return[.]" (Doc. 39-2 at 10, ¶ 52.) Plaintiffs allege that the reason why John Doe "was not able to return to Marshfield immediately upon being medically cleared was because WCMHS refused to promptly allow it." *Id.* at ¶ 53.

John Doe's ISA was in effect from February 1, 2022 until January 30, 2023 and

stated that "WCMHS [would] maintain oversight of the residence and support staff; monitor Medicaid services and help as needed; coordinate with a Registered Nurse regarding medication administration oversight; research and coordinate services of a clinical autism specialist and speech-language pathologist; coordinate a sensory evaluation; and coordinate additional services as needed." *Id.* at 11, ¶ 55. Plaintiffs allege that since John Doe's ISA became effective, "WCMHS [did] not provide[] any coordination with a clinical autism specialist, meaningfully engage[] with a speech-language pathologist, or conduct[] a sensory evaluation." *Id.* at ¶ 56. They further state that WCMHS "failed to provide enough staff members, and those assigned to assist [John] Doe have been inadequately trained and made basic errors like allowing [John] Doe to stray from their physical proximity, endangering him." *Id.*

Plaintiffs allege that WCMHS's failures to provide services pursuant to the ISA placed John Doe at an increased risk of institutionalization, and WCMHS's failure to consult with an autism specialist, engage with a speech-language pathologist, or conduct a sensory evaluation were discussed at team meetings where WCMHS representatives, DAIL, Director Garabedian, VCIN staff, and others were present. They allege that DAIL knew that John Doe was not receiving services and supports as required by his ISA.

In January 2022, WCMHS contacted Linda and Kelcey Luxenberg and stated that John Doe would be reevaluated in approximately six months, but Plaintiffs allege that "no reevaluation has been completed since the . . . ISA became effective in February of 2022." *Id.* at 12, ¶ 60. The ISA states that staff members will support John Doe in engaging in community and relationship-building, but this has not taken place. Plaintiffs allege that WCMHS has not provided John Doe with a case manager and that Ms. Moulton is aware of this, but has taken no steps to rectify it. John Doe's guardians have made efforts to obtain and coordinate services for John Doe because of WCMHS's alleged failure to implement the ISA.

Plaintiffs acknowledge that John Doe's guardianship changed a number of times. In August 2020, Linda Luxenberg's guardianship was terminated and the Office of the Public Guardian, which is a DAIL division, was appointed allegedly because Linda

Luxenberg expressed concerns that the VCIN crisis bed was not a safe placement for John Doe. In May 2021, guardianship was transferred from the Public Guardian to John Doe's aunt and Kelcey Luxenberg. On August 2, 2022, Linda Luxenberg was reappointed co-guardian together with Kelcey Luxenberg. John Doe's aunt is no longer a guardian. Since August 2, 2022, Plaintiffs allege that John Doe's co-guardians "have made efforts . . . to obtain necessary services for [John] Doe[,] including by transferring his services" to a provider other than WCMHS. (Doc. 39-2 at 14, ¶ 72.)

On September 7, 2022, Linda Luxenberg, WCMHS, John Doe's Guardian ad Litem, and "other advocates" met to discuss John Doe's transfer from the Marshfield home. *Id.* at ¶ 73. Keith Grier of WCMHS stated he had spoken with the Executive Director of LCMHS about the possibility of LCMHS providing services for John Doe.

LCMHS told John Doe's guardians on September 9, 2022 that "it was short-staffed and unable to provide [John] Doe with adequate services." *Id.* at ¶ 77. His guardians then identified a number of potential individuals willing to work with him and provided WCMHS and DAIL with a list of names, but their suggestions were allegedly ignored.

Another meeting took place on September 21, 2022 to discuss John Doe's transition from Marshfield to Lamoille County, and the meeting attendees "agreed that LCMHS and DAIL should be involved in planning any transition to Lamoille." *Id.* at 14, ¶ 74. The following day, John Doe's guardians, through counsel, "sent out meeting notes and copied [Director] Garabedian" identifying questions "that needed to be answered by DAIL to make progress on transition." *Id.* Plaintiffs allege that between September 7 and September 21, 2022, no progress was made. On September 27, 2022, an unidentified WCMHS employee allegedly stated "DAIL's lack of involvement was impeding the transfer of [John] Doe's services[.]" *Id.* at ¶ 76.

Plaintiffs allege that on or around September 27, 2022, their counsel spoke to General Counsel of DAIL, Stuart Schurr, about planning John Doe's transition. Plaintiffs' counsel then sent Attorney Schurr a draft transition proposal, but DAIL did not respond to the draft plan until October 4, 2022. DAIL allegedly stated that it was "concerned that

[the draft proposal] fails to identify many of the essential components necessary for a meaningful conversation regarding [John Doe's] transition from one community-based program to another[.]" (Doc. 39-2 at 16, ¶ 79.) DAIL allegedly proposed no alternative method to facilitate John Doe's transition and stated that DAIL representatives "would not be a part of transition planning because that was not the role of the agency," but provided that "they could approve plans and address conflicts as they arose." *Id.* at ¶ 80.

On October 3, 2022, Ms. Moulton sent Plaintiffs an email with the subject line: "WCMHS Notice of Termination" and copied Commissioner White and Director Garabedian. Ms. Moulton stated that all WCMHS services would be terminated by November 3, 2022 because John Doe's "guardians had complained about WCMHS services[.]" *Id.* at ¶ 81. Ms. Moulton additionally stated that WCMHS and DAIL would cooperate with transition planning, but did not explain in detail how. Plaintiffs allege that no additional information was provided and they were not advised of John Doe's appeal or due process rights.

Plaintiffs contend a termination of services will render John Doe homeless and endanger his safety. They assert that neither DAIL nor WCMHS have identified any justification for terminating John Doe's services other than Linda Luxenberg's objections. They also allege that Commissioner White and Director Garabedian were involved in the decision to terminate John Doe's services and that those defendants, as well as others at DAIL, knew of WCMHS's plan to terminate John Doe's services before the notice was sent to his guardians. Plaintiffs allege that these individuals "took no action to prevent the termination or ensure there was a plan for the transition." *Id.* at 17, ¶ 85.

On October 4, 2022, Attorney Schurr, on behalf of DAIL, emailed John Doe's counsel stating, "while DAIL is available to provide support, as needed, it remains [DAIL's] expectation that the guardians will take the lead on the transition to an alternate community-based program, with WCMHS as the referring agency. Accordingly, DAIL has taken no steps to invite LCMHS to join tomorrow's discussion." *Id.* at 17, ¶ 88 (internal quotation marks omitted) (alteration in original).

10

The next day, Linda Luxenberg met with representatives of DAIL, including Director Garabedian and Ms. Moulton. "DAIL agreed that [John] Doe should not be without shelter as of November 3, but offered no concrete plans for establishing services or housing elsewhere other than a possible crisis bed somewhere in Lamoille County" and "WCMHS had no suggestions for where [John] Doe will reside after [] November 3, nor who will provide services." *Id.* at 17-18, ¶ 89. The parties decided that John Doe's guardians, WCMHS, and LCMHS would meet and work towards a transition plan and submit either a plan or status update to DAIL by October 12, 2022. Following that meeting on October 5, John Doe's guardians emailed WCMHS and LCMHS to schedule a transition plan meeting. They also provided a draft transition proposal. Plaintiffs allege that "neither WCMHS nor LCMHS have agreed to a meeting." (Doc. 39-2 at 18, ¶ 90.)

On October 7, 2022, John Doe's counsel filed an appeal of the WCMHS termination decision with the Vermont Human Services Board (the "VHS Board") and requested that services remain in place in the interim. The appeal was sent to both DAIL and WCMHS, but Plaintiffs allege that WCMHS never responded, and DAIL responded only by filing a motion to dismiss. The VHS Board scheduled an initial status conference for November 4, 2022, and then after being reminded "that services and housing were to be terminated on November 3rd, and that a decision on the request for a stay was needed prior thereto," *Id.* at 18, ¶ 92, it responded that "correspondence on that issue had been received but gave no indication that such a decision would be made before termination." *Id.* Plaintiffs allege that this exposed John Doe "to a substantial risk of irreparable harm." *Id.* at 19, ¶ 92.

On October 12, 2022, WCMHS, through counsel, "filed an unsolicited letter in Washington County Superior Court – Probate Division[,]" the court in which John Doe's guardianship has been adjudicated. *Id.* at ¶ 93. That same day, LCMHS emailed John Doe's guardians, as well as representatives from WCMHS, stating:

> We have been working away at getting further clarification from DAIL on the current services and what the program array is and could be for [John] Doe. As well we have been meeting with VCIN and WCMHS to determine what has been successful from their perspective. Thus, we have been in a

> collection mode to respond to the myriad of concerns and ideas in the
> document you sent. By the end of the day I will be forwarding to you a
> response of what we are hoping will move us all to a clear and useful plan
> for success in the next months ahead.

*Id.* at 20, ¶ 95 (emphasis omitted). Upon information and belief, Plaintiffs allege that
Director Garabedian "is one of the individuals from DAIL referenced in LCMHS's
email . . . [who] was providing information to LCMHS regarding [John] Doe's services."
(Doc. 39-2 at 20, ¶ 96.)

Plaintiffs allege that as John Doe's guardians, through counsel, they replied with
suggestions of times to meet but that they received no reply. They allege that "DAIL is
influencing LCMHS's non-response and hampering their ability to provide services—and
a home—for [John] Doe." *Id.* at ¶ 99. On October 17, 2022, DAIL filed a motion in
Probate Court to remove Plaintiffs as John Doe's guardians and to have DAIL appointed
as his guardian because Linda Luxenberg was "not working well with [John Doe's]
service providers." *Id.* at ¶ 100.

Plaintiffs allege that DAIL and WCMHS "have continued to criticize and
antagonize Linda and Kelcey [Luxenberg] and seek removal of their guardianship over
[John] Doe[.]" *Id.* at ¶ 103. These efforts have allegedly continued "even after the
Stipulated Court Order in this case requiring the [p]arties to work together in good faith."
*Id.* at 21, ¶ 105.

Following the court's October 27, 2022 Stipulated Order, LCMHS took over John
Doe's Medicaid Waiver and became the lead agency providing him with services. As of
the date of Plaintiffs' motion to amend the complaint, Plaintiffs allege that WCMHS
continues to provide staff to work with John Doe, that John Doe remains in the
Marshfield home, and that WCMHS continues to support LCMHS in providing services
to him. Plaintiffs allege that communication between them and LCMHS remains
challenging and that LCMHS has attempted to avoid communicating with them.

Asserting that there are "no long-term plan[s] in place to provide services or
alternate housing for [John] Doe[,]" *id.* at 20, ¶ 102, and that John Doe "suffered and is
likely to suffer immediate, irreparable harm due to Defendants' acts and omissions[,]"

(Doc. 39-2 at 25, ¶ 120), Plaintiffs continue to seek injunctive relief.

## IV.   Conclusions of Law and Analysis.

### A.   Whether the Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims.

A case is properly dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) "if the court 'lacks the statutory or constitutional power to adjudicate it[.]'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "[T]he party asserting federal [subject matter] jurisdiction bears the burden of establishing jurisdiction" exists. *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006).

In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1):

> the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction. The court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing.

*Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (internal alteration, citation, and quotation marks omitted).

WCMHS and Ms. Moulton seek dismissal of Plaintiffs' claims against them in Counts I, II, III, IV, and V pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that the claims are not ripe and because Plaintiffs lack Article III standing. Although Plaintiffs allege constitutional or statutory violations arising out of Defendants' proposed removal of John Doe from his placement in the Marshfield home and proposed termination of his healthcare services on November 3, 2022, this has not yet occurred.

Counts I and II allege due process violations arising from the proposed removal and termination without sufficient notice of his rights or opportunity to contest the

13

decision.[2] Counts III, IV, and V allege that the proposed termination increases John Doe's risk of institutionalization and that, over the course of two years, Defendants failed to provide adequate services and support to John Doe and to accommodate his disabilities, including his communication limitations.[3] Count IV alleges an ADA claim against DAIL and WCMHS. *See* Doc. 39-2 at 29, ¶ 139.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova*, 201 F.3d at 113. "To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). Ripeness is "rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority[,]" *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005), and is "peculiarly a question of timing." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (internal quotation marks omitted) (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974)).

---

[2] Count I alleges that Defendants' proposed removal of John Doe from his Marshfield home placement and proposed termination of his healthcare services "without affording him the opportunity to contest his removal [and termination of services] and without notice of his rights" will violate his procedural due process rights under the Fourteenth Amendment of the U.S. Constitution and Article 4 of the Vermont Constitution. (Doc. 39-2 at 25, ¶¶ 122-23.) Count II alleges that Defendants' "proposed forced termination of all Medicaid services as of November 3, 2022 will violate Plaintiff's right to a fair hearing before termination of services as provided by 42 U.S.C. § 1396a(a)(3)." *Id.* at 27, ¶ 127.

[3] Count III alleges that Defendants' decision to terminate John Doe's services and failures to "provide adequate services and support[] to [him] over the last two years" and to "accommodate his disabilities" have placed him at a heightened risk of institutionalization and deprived him of equal access to communication in violation of the federal Rehabilitation Act. *Id.* at 27, ¶ 133. Count IV alleges that Defendants' decision to terminate John Doe's services and housing places him at substantial risk of institutionalization in violation of his rights to receive services in the most integrated setting as provided by the ADA pursuant to 42 U.S.C. § 12132. Count V alleges that Defendants' decision to terminate John Doe's services beginning on November 3, 2022 and their failures to provide adequate services and to accommodate his disabilities place him at risk of institutionalization in violation of the VFHPA.

Claims that involve "contingent future events that may not occur as anticipated, or indeed may not occur at all[,]" are not ripe. *Thomas*, 473 U.S. at 580-81. "Determining whether administrative action is ripe for judicial review requires [the court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). "The fitness of the issues for judicial decision prong requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 596 (S.D.N.Y. 2013) (internal quotation marks and alteration omitted) (quoting *Murphy*, 402 F.3d at 347).

"The hardship to the parties prong injects prudential considerations into the mix requiring courts to gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined." *Id.* (internal quotation marks and alterations omitted) (quoting *Murphy*, 402 F.3d at 347.)

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

Standing "is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of N.Y.*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[T]he irreducible constitutional minimum of standing contains three elements[:]"

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.] Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks,

citations, alterations, and footnote omitted). Plaintiffs "must clearly allege facts
demonstrating each element" of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S.
330, 338 (2016) (alteration and internal quotation marks omitted). At the pleading stage,
standing is not "an onerous standard[,]" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47,
55 (2d Cir. 2016), and presents a "relatively modest" burden. *Bennett v. Spear*, 520 U.S.
154, 171 (1997).

 "Standing and ripeness are closely related doctrines that overlap 'most notably in
the shared requirement that the [plaintiff's] injury be imminent rather than conjectural or
hypothetical.'" *New York C.L. Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008)
(quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir.
2006) (alteration in original); *see also Liu v. Democratic Nat'l Comm.*, 2022 WL
4372587, at *1 (2d Cir. Sept. 22, 2022) (explaining that the ripeness doctrine "overlaps
with standing"); *United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004) (explaining that
the ripeness analysis ensures "'that a dispute has generated injury significant enough to
satisfy the case or controversy requirement of Article III of the U.S. Constitution' by
'preventing a federal court from entangling itself in abstract disagreements over matters
that are premature for review because the injury is merely speculative and may never
occur'") (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d
83, 90 (2d Cir. 2002)).

 Because Ms. Moulton and WCMHS primarily "focus[] [their] argument on
ripeness," the court will "consider standing within the constitutional ripeness challenge."
*Grandeau*, 528 F.3d at 130 n.8; *see also Bronx Household of Faith v. Bd. of Educ. of City
of New York*, 492 F.3d 89, 111 (2d Cir. 2007) (explaining the differences between
ripeness and standing but focusing "on those decisions which concern the ripeness of the
dispute, regardless of whether they speak in terms of 'ripeness' or of 'standing'").

 WCMHS and Ms. Moulton argue that Plaintiffs' claims are not ripe because they
depend upon future events that may not transpire. Pointing to the fact that John Doe
continues to live in the Marshfield home and continues to receive services, they contend
that any claims based on a termination of services coupled with a risk of

institutionalization are purely hypothetical. Likewise, they argue that whether John Doe
will be denied notice and an opportunity to be heard in the future is equally speculative.

"[T]here is Second Circuit and out-of-circuit appellate law holding that the mere
*threat* of a loss of medical care, even if never realized, constitutes irreparable harm."
*Strouchler v. Shah*, 891 F. Supp. 2d 504, 522 (S.D.N.Y. 2012) (emphasis in original); *see
also Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979) ("[T]he threatened
termination of benefits such as medical coverage for workers and their families obviously
raised the spectre of irreparable injury."); *LaForest v. Former Clean Air Holding Co.,
Inc.*, 376 F.3d 48, 55 (2d Cir. 2004) (same); *United Steelworkers of Am., AFL-CIO v.
Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) ("We should then conclude that retired
workers [deprived of health insurance and thus at risk of losing medical care] would
likely suffer emotional distress, concern about potential financial disaster, and possibly
deprivation of life's necessities (in order to keep up in insurance payments). In short,
taken together, these facts would show harm that, in this sort of case, is 'irreparable.'").

Moreover, "[w]hen an alleged deprivation of a constitutional right is involved,
most courts hold that no further showing of irreparable injury is necessary." *Mitchell v.
Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (internal quotation marks omitted) (quoting 11
C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 440 (1973)). In this
instance, in light of his need for housing and services, and their threatened disruption,
John Doe "face[s] an 'actual or imminent' injury that [is] 'not conjectural or
hypothetical,'" and which "is sufficient to establish concrete injury for standing
purposes." *Fishman by Fishman v. Daines*, 247 F. Supp. 3d 238, 248 (E.D.N.Y. 2017)
(quoting *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003)).

To the extent that Counts I and II allege claims regarding the adequacy of the
termination notice provided by WCMHS, that notice has been provided and is not a
speculative future event. Similarly, to the extent that Counts III, IV, and V allege
challenges to the adequacy of services that WCMHS provided to John Doe over the two
years prior to the filing of suit, those claims also involve past events and cannot be
dismissed on ripeness grounds. Although Counts I and II focus on the proposed removal

17

of John Doe from the Marshfield home and the proposed termination of his healthcare services, neither of which has occurred, because both future events have been threatened and because there remains a plausible threat of a loss of medical care, Plaintiffs' claims are ripe.

With regard to Plaintiffs' claims relating to the risk of institutionalization, this type of claim may be brought under the ADA when a "a public entity's failure to provide necessary services . . . puts 'plaintiffs at a substantial risk of requiring institutionalized care[.]'" *M.G. v. New York State Off. of Mental Health*, 572 F. Supp. 3d 1, 11 (S.D.N.Y. 2021) (quoting *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016)). "[A] plaintiff 'need not wait until the harm of institutionalization or segregation occurs or is imminent' in order to bring a claim under the ADA." *Davis*, 821 F.3d at 262 (quoting U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, Q. 6); *see also M.G.*, 572 F. Supp. 3d at 11 ("In this context, the injury in fact is not actual or imminent institutionalization, but rather the failure to receive services, resulting in Plaintiffs' increased likelihood of institutionalization."). At the pleading stage, the AC plausibly alleges that a risk of institutionalization persists.

For the reasons stated above, the court DENIES WCMHS's and Ms. Moulton's motion to dismiss for lack of ripeness and standing. *See Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 36 (S.D.N.Y. 2020) ("The burden of showing that an injury is linked to a defendant's conduct" for standing purposes "is 'relatively modest[.]'"). It also concludes that Plaintiffs' amended claims alleging future risks of harm are not futile and thus grants leave to assert them.

## V.    Whether Plaintiffs Plausibly State a Claim Against Ms. Moulton Pursuant to Fed. R. Civ. P. 12(b)(6).

To withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege sufficient

facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (internal citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not judge credibility, "weigh the evidence," or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

Ms. Moulton seeks dismissal of the claims brought against her on the basis that she is entitled to qualified immunity. At the same time, in her reply, she argues she is not a state actor for Plaintiffs' § 1983 claims. The AC reveals this same inconsistency.[4] The court addresses first whether Ms. Moulton is a "state actor" for Plaintiffs' § 1983 claims before addressing the issue of qualified immunity because if Ms. Moulton did not act under the color of state law, the issue of qualified immunity is moot.

Count I and II allege that Ms. Moulton violated John Doe's rights to due process under the Fourteenth Amendment of the United States Constitution (Count I) and 42 U.S.C. § 1396a(a)(3) (Count II) under § 1983. Section 1983 "is not itself a source of substantive rights" but provides "a method for vindicating federal rights elsewhere

---

[4] *Compare* Doc. 39-2 at 2, ¶¶ 7, 8 (alleging that Ms. Moulton is the Executive Director of WCMHS, "a non-profit organization in Vermont"), *with id.* at 33, ¶ 165 (alleging that Ms. Moulton was "acting under color of law").

conferred[.]" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Although not entirely clear, the AC appears to allege claims against Ms. Moulton solely in her capacity as Executive Director of WCMHS. The United States Supreme Court has explained the difference between individual and official capacity suits as follows:

> Personal-capacity suits seek to impose personal liability upon a government official for actions [s]he takes under color of state law. . . . Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon* [*v. Holt*], 469 U.S. [464] at 471-72 [(1985)]. It is *not* a suit against the official personally, for the real party in interest is the entity.

*Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

The doctrine of qualified immunity "affords protection to a government official only from suit in his individual capacity, that is, only insofar as the legal action attempts to fasten personal liability on the official for his or her conduct taken under color of state law." *P.C. v. McLaughlin*, 913 F.2d 1033, 1039 (2d Cir. 1990); *see also Finch v. City of New York*, 591 F. Supp. 2d 349, 360 (S.D.N.Y. 2008) ("[A]n official sued in his official capacity may not take advantage of a qualified immunity defense.") (internal quotation marks omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 556 n.10 (1985) (Brennan, J., concurring in part and dissenting in part) (alteration in original)).

Before the issue of qualified immunity is even reached, a § 1983 claimant must allege the violation or deprivation was committed by a person acting "under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Stated differently, "[b]ecause the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Fabrikant v. French*, 691 F.3d 193, 206

(2d Cir. 2012); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful[.]'") (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

Ms. Moulton argues that WCMHS is a state agency and, as its Executive Director, she is a state actor. She cites no evidence to support this contention. "State action requires both an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and that the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Sullivan*, 526 U.S. at 50 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (internal quotation marks and emphasis omitted). The actions of a private entity may be attributable to the state only when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (alterations in original). "It is not enough, however, for a plaintiff to plead state involvement in *some activity* of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the *activity that caused the injury* giving rise to the action." *Id.* (internal quotation marks omitted) (emphasis in original).

> [T]he crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not [] between the government entity and the private *actor*. While the respective benefits and burdens flowing from government funding and regulation alone might speak to the latter, in the absence of some indication of how

they shaped or compelled the challenged conduct, they simply do not speak
to the former in any meaningful way.

*Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 364 (S.D.N.Y. 2001).
"Government funding of a private entity, . . . no matter how extensive, is insufficient to
transform otherwise private conduct into state action." *Id.* at 362 (citing *Rendell-Baker v.
Kohn*, 457 U.S. 830, 840 (1982)).

In seeking qualified immunity, Ms. Moulton and WCMHS argue that the AC
alleges acts of WCMHS are attributable to the State of Vermont under the "close nexus"
test. They contend that WCMHS "provided services to John Doe in fulfillment of its
mandate from the State of Vermont, which in turn delegated its federal mandate from the
Americans with Disabilities Act to WCMHS." (Doc. 26 at 8.) They further argue that
WCMHS and DAIL, a state actor, acted in concert, that WCMHS was a "willful
participant in joint activity" with DAIL, and that its functions were "entwined" with state
policies. *Id.* at 9 (internal quotation marks omitted). The AC does not specifically identify
the factual basis for its allegation that Ms. Moulton acted under the color of state law.

"The nexus/joint action test involves situations where the government has 'so far
insinuated itself into a position of interdependence with the [private party] that it was a
joint participant in the enterprise.'" *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir.
1992) (quoting *NBC v. Commc'n Workers of Am., AFL-CIO*, 860 F.2d 1022, 1026 (11th
Cir. 1988) (alteration in original)); *see also Dennis v. Sparks*, 449 U.S. 24, 27 (1980)
("[T]o act 'under color of' state law for § 1983 purposes . . . [i]t is enough that [a private
party] is a willful participant in joint action with the State or its agents."). "The
touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy'
shared by the private actor and" the government. *Forbes v. City of New York*, 2008 WL
3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (quoting *Ginsberg v. Healey Car & Truck
Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)). Plaintiffs must allege that "there is a
sufficiently close nexus between the State and the challenged action of the regulated
entity so that the action of the latter may be fairly treated as that of the State itself." *Blum*,
457 U.S. at 1004 (internal quotation marks omitted) (quoting *Jackson v. Metro. Edison*

*Co.*, 419 U.S. 345, 351 (1974)).

In *Blum v. Yaretsky*, a plaintiff challenged private nursing homes' decisions to discharge or transfer patients to lower levels of care without adequate notice or hearings. Although subject to extensive state regulations and dependent on the state for funds, the nursing homes were privately owned and operated. Holding the nursing homes' decisions did not constitute state action because they were "made by physicians and nursing home administrators, all of whom are concededly private parties[,]" the mere existence of state regulations did not "demonstrate that the State is responsible for the decision to discharge or transfer particular patients." 457 U.S. at 1007-08.[5]

In the instant case, Plaintiffs allege that WCMHS, a non-profit organization, is the "Designated Agency" for Washington County, in which capacity it receives funding from DAIL, a department within the Vermont AHS. DAIL requires Designated Agencies to provide services to eligible Vermonters, which they may do either directly or through a contract with another provider or individuals. Plaintiffs allege that DAIL has adopted rules and procedures for application and certification standards for its programs. One of these rules is that local agencies must develop ISAs with the individuals they serve, which, in turn, set forth the Designated Agency's obligations in connection with each client. DAIL allegedly commented on a proposed transition plan for John Doe in

---

[5] *See also Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) (holding that decision to terminate teachers and a counselor at a non-profit, privately operated school for high school students that received nearly all of its funding from the state did not constitute state action because the "regulators showed relatively little interest in the school's personnel matters" even though the school was "extensively regulated"); *Polk Cnty. v. Dodson*, 454 U.S. 312, 321 (1981) (holding that a public defender did not act under color of state law even though he was employed by the state and appointed by the state because "a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client" and is not "the servant of an administrative superior"); *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 258 (2d Cir. 2008) (concluding that corporate owner and employees of group home for adults with mental disabilities were not state actors when they restricted plaintiffs' contact with their son, even though the state had established "substantive rights for patients in mental health facilities and procedures for protecting these rights" because those rights did not, without more, "amount to 'significant encouragement,' 'willful particip[ation],' or state 'entwin[ing]'" and decisions were made by facility administrators, not the state) (alterations in original).

September 2022, but stated it would not be part of the transition planning, although it "could approve plans and address conflicts as they arose." (Doc. 39-2 at 16, ¶ 80.)

Ms. Moulton emailed John Doe's guardians WCMHS's Notice of Termination, copying Commissioner White and Director Garabedian, because John Doe's guardians "had complained about WCMHS services" and noted that WCMHS and DAIL would cooperate with transition planning. *See id.* at 16, ¶ 81. Plaintiffs allege, "[upon] information and belief," that DAIL employees "were involved in the decision to terminate [John] Doe's services[,]" *id.* at 17, ¶ 84, but "took no action to prevent the termination or ensure there was a plan for the transition." *Id.* at ¶ 85. DAIL's awareness of the decision to terminate John Doe's services, alleged unspecified role in decision-making, and its failure to intervene fall short of plausibly pleading that WCMHS was a state actor under the "close nexus test."

To the extent that Plaintiffs contend that their claims arise out of deficient notice of John Doe's due process and appellate rights as a result of Ms. Moulton's notice of termination, they do not allege that DAIL participated in drafting or sending that notice. Instead, the action appears to have been solely that of a non-profit agency.

Because Plaintiffs have failed to plausibly allege Ms. Moulton acted under color of state law as required for their § 1983 claims, Plaintiffs' claims against Ms. Moulton in Counts I and II are DISMISSED. Plaintiffs' request for leave to amend to assert a First Amendment claim against Ms. Moulton is likewise denied as futile. *See Zieper v. Metzinger*, 474 F.3d 60, 65-66 (2d Cir. 2007) ("[T]he First Amendment prohibits government officials from encouraging the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'") (quoting *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983)).

Without a plausible allegation that WCMHS and Ms. Moulton are state actors, the issue of qualified immunity is moot.

## VI.    Whether Ms. Moulton is Entitled to Qualified Immunity from Plaintiffs' State Law Claims.

Plaintiffs allege three state law claims against Ms. Moulton: violation of their due process rights under Article 4 of the Vermont Constitution (Count I); negligence for failing to provide adequate services (Count VI);[6] and retaliation for threatening to terminate John Doe's services when Plaintiffs criticized the care John Doe was receiving (Count VII).

Under Vermont law, "[q]ualified immunity attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Baptie v. Bruno*, 2013 VT 117, ¶ 11, 195 Vt. 308, 314, 88 A.3d 1212, 1216 (internal quotation marks omitted). "Thus, if the official's conduct does not violate clearly-established rights of which a reasonable person would have known, the official is protected by qualified immunity from tort liability." *Sprague v. Nally*, 2005 VT 85, ¶ 4, 178 Vt. 222, 226, 882 A.2d 1164, 1168 (quoting *Cook v. Nelson*, 712 A.2d 382, 384 (Vt. 1998)).

Although the Vermont Supreme Court has noted that qualified immunity "is extended to lower level officers, employees, and agents[,]" *Civetti v. Turner*, 2022 VT 64, ¶ 8, 296 A.3d 132, 136 (quoting *O'Connor v. Donovan*, 2012 VT 27, ¶ 6, 191 Vt. 412, 416, 48 A.3d 584, 586), it has not extended qualified immunity to private individuals working for private non-profit organizations receiving funding from or otherwise contracting with the State of Vermont.

Ms. Moulton argues that WCMHS receives money from DAIL to perform "an important public service[,]" but does not explain how that entitles her to the qualified immunity available to government employees. (Doc. 26 at 10.) She also does not explain how she can both fail to qualify as a state actor for Plaintiffs' § 1983 claims and yet be granted qualified immunity as a state employee for Plaintiffs' state law claims.

The provision of health services is not a "fundamental and uniquely governmental

---

[6] The AC does not name Ms. Moulton in Count VI, but Plaintiffs assert in their opposition to WCMHS's and Ms. Moulton's motion to dismiss that Count VI does apply to Ms. Moulton, as "each [count] incorporated all foregoing factual allegations[.]" (Doc. 52 at 5.)

obligation" the government owes to its citizens. *Hum. Rts. Def. Ctr. v. Correct Care Sols., LLC*, 2021 VT 63, ¶ 21, 215 Vt. 362, 372-73, 263 A.3d 1260, 1267. It is, instead, a service provided by a wide array of private persons and entities. The record before the court does not permit the court to find, as a matter of law, that Ms. Moulton is a state employee or a state public official.

Because Ms. Moulton has failed to sustain her burden to prove that qualified immunity shields her from Plaintiffs' state law claims, and because she seeks dismissal of those claims on no other basis other than ripeness and standing, her motion to dismiss Plaintiffs' state law claims is claims is DENIED. *See Blissett v. Coughlin*, 66 F.3d 531, 539 (2d Cir. 1995) ("The defendant bears the burden of pleading and proving the affirmative defense of qualified immunity.").

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion to amend their Complaint and GRANTS IN PART AND DENIES IN PART Ms. Moulton's and WCMHS's motion to dismiss. Because WCMHS moved to dismiss the claims against it only on ripeness and standing grounds, and because the court denied dismissal on this basis, the AC remains pending against WCMHS. Ms. Moulton is dismissed from the § 1983 claims asserted against her in Counts I (procedural due process)[7] and II (Medicaid due process). Counts I (procedural due process under the Vermont Constitution), VI (negligence) and VII (retaliation) remain pending as to Ms. Moulton. Plaintiffs' motion for leave to amend their complaint to assert additional § 1983 claims and a First Amendment claim is denied on futility grounds in the absence of factual allegations establishing Ms. Moulton and WCMHS as state actors.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 11th day of August, 2023.

Christina Reiss, District Judge
United States District Court

---

[7] Ms. Moulton does not address whether a procedural due process claim under the Vermont Constitution likewise requires state action.