UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 OCT 13 PM 4:32

CLERK

BY _____

PROPERTY CLERK

LINDA LUXENBERG and                 )
KELCEY LUXENBERG, as Guardians      )
and next best friends of JOHN DOE; and )
LINDA LUXENBERG, for herself,       )
                                    )
Plaintiffs,                         )
                                    )
            v.                      )       Case No. 2:22-cv-00188
                                    )
VERMONT DEPARTMENT OF               )
DISABILITIES, AGING AND             )
INDEPENDENT LIVING; MONICA          )
WHITE, in her official and individual )
capacities; JENNIFER GARABEDIAN,    )
in her official and individual capacities; )
WASHINGTON COUNTY MENTAL            )
HEALTH SERVICES INC.; MARY          )
MOULTON, in her official and individual )
capacities, and LAMOILLE COUNTY     )
MENTAL HEALTH SERVICES, INC.        )
                                    )
Defendants.                         )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE
DAIL DEFENDANTS' MOTION TO DISMISS**
(Doc. 74)

Plaintiffs Linda Luxenberg and Kelcey Luxenberg, as guardians and next best

friends of John Doe, Linda Luxenberg individually, and John Doe ("Plaintiffs") bring this

action against Defendants Vermont Department of Disabilities, Aging and Independent

Living ("DAIL"); Monica White ("Commissioner White"), in her individual capacity and

her official capacity as the Commissioner of DAIL; Jennifer Garabedian ("Director

Garabedian"), in her individual capacity and her official capacity as the Director of

DAIL's Developmental Disabilities Services Division (collectively, the "DAIL

Defendants"); Washington County Mental Health Services Inc. ("WCMHS"); Mary

Moulton, in her capacity as the Executive Director of WCMHS; and Lamoille County Mental Health Services, Inc. ("LCMHS") (collectively, "Defendants"). Plaintiffs seek declaratory and injunctive relief arising out of Defendants' alleged termination of mental health services for John Doe without the consent of Plaintiffs, failure to develop a transition plan of services for John Doe, and failure to provide funding for an appropriate placement for him.

Pending before the court is the motion to dismiss filed by DAIL, Commissioner White, and Director Garabedian pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim filed on April 11, 2023. (Doc. 74.) Plaintiffs opposed the motion on May 25, 2023 (Doc. 99), and the DAIL Defendants replied on June 8, 2023 (Doc. 117), at which point the court took the motion to dismiss under advisement.

The Amended Complaint (the "AC") asserts eight causes of action: a procedural due process claim under the Fourteenth Amendment to the United States Constitution and Article 4 of the Vermont Constitution (Count I); a Medicaid Due Process claim under 42 U.S.C. § 1396a(a)(3) (Count II); a violation of the Rehabilitation Act (the "RA"), 29 U.S.C. § 701 (Count III); a violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132 (Count IV); a violation of the Vermont Fair Housing and Public Accommodations Act (the "VFHPA"), 9 V.S.A. § 4502 (Count V); a negligence claim (Count VI); a retaliation claim in violation of 18 V.S.A. § 8728(b) (Count VII); and a violation of John Doe's and Linda Luxenberg's right to free speech under the First Amendment to the United States Constitution (Count VIII).

Plaintiffs assert that this court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367.

Plaintiffs are represented by Zachary D. Hozid, Esq., and James A. Valente, Esq. The DAIL Defendants are represented by Edward M. Kenney, Esq. Defendants WCMHS, Ms. Moulton, and LCMHS are represented by Richard J. Windish, Esq., Bernard D. Lambek, Esq., and Elizabeth A. Willhite, Esq.

I.    **The AC's Factual Allegations.**

John Doe is an adult under the guardianship of his mother, Linda Luxenberg, and sister, Kelcey Luxenberg. Plaintiffs bring their claims on their own and on his behalf.

John Doe has autism spectrum disorder ("ASD") and Landau-Kleffner syndrome, which "substantially impair his sensory processing, verbal communication ability, and emotional and behavioral regulation to such an extent that he cannot function in the community without the assistance of staff and technological aids." (Doc. 39-2 at 1-2, ¶ 1.) He "has received disability services in Vermont for most of his life." *Id.* at 6, ¶ 27.

DAIL is a department within the Vermont Agency of Human Services (the "Vermont AHS"). Vermont's Developmental Disabilities Act (the "Act") requires that DAIL "'plan, coordinate, administer, monitor and evaluate' services for those in Vermont with developmental disabilities." *Id.* at 5, ¶ 19 (quoting 18 V.S.A. § 8723). DAIL provides funding to "Designated Agencies and Specialized Services Agencies to provide direct care and support" and requires those agencies "to provide services to all eligible individuals in each of Vermont's [fourteen] counties[.] . . . Designated Agencies must provide services directly or contract with other providers or individuals to deliver support and services consistent with available funding, state and local System of Care Plans and state and federal guidelines." *Id.* ¶¶ 23-24. DAIL's rules and procedures require that "local agencies collaboratively form Individual Support Agreements ('ISAs') with the individuals they serve, setting forth the specific obligations of the Designated Agency in connection with each disabled individual." *Id.* at 6, ¶ 25.

WCMHS is a non-profit organization in Vermont and is the Designated Agency for Washington County, where John Doe resides, and is obligated to provide adequate services to him pursuant to the Act. *Id.* ¶ 26.

In December 2017, Melmark New England, an organization providing developmental disability services and assessments ("Melmark"), evaluated John Doe to determine his service needs, assess his progress, and make recommendations. WCMHS and DAIL both had access to Melmark's evaluation, which allegedly concluded that John Doe had "significant communication and behavioral barriers" and "recommended that the

structure of his programming be designed through consultation with experts in autism and severe behavioral challenges, and that [John] Doe's providers should manage the element causing many of his crises—transitions—by utilizing a visual schedule with carefully[] planned, developmentally appropriate options[.]" (Doc. 39-2 at 8-9, ¶ 43.)

John Doe previously lived in Waitsfield, Vermont, where he was assisted by Upper Valley Services, a Specialized Service Agency funded by DAIL. In May 2020, he experienced a crisis and was transported to Dartmouth-Hitchcock Medical Center ("DHMC"). Thereafter, he was unable to return to Waitsfield and stayed in DHMC's emergency department until a residential placement was arranged. A team, including DAIL and Commissioner White's predecessor, Commissioner Monica Hunt, developed a residential placement for John Doe. In August 2020, John Doe was moved to "a short-term crisis bed" owned and operated by the Vermont Crisis Intervention Network ("VCIN"). *Id.* at 7, ¶ 33. Seventy-two hours later, John Doe was rehospitalized at DHMC.

WCMHS and DAIL thereafter "decided to create a program in Marshfield, Vermont, which led WCMHS to purchase the single family house in which [John] Doe currently resides." *Id.* ¶ 38 (the "Marshfield Home"). DAIL supervises and funds the program, while WCMHS was responsible for day-to-day oversight and decision-making. John Doe's "care [was] based on a needs assessment by WCMHS finding his needs to be significant in most areas[] and a behavior support plan developed by WCMHS in August of 2020. Both were approved by DAIL, which allocated over $800,000 annually for each year to [provide] for services to benefit [John] Doe[.]" *Id.* at 8, ¶ 41.

Since September 2020, John Doe has lived at the Marshfield Home, which is owned and operated by WCMHS. The home is equipped with technology which allows WCMHS staff to monitor John Doe from a room that is inaccessible to him. The video camera system is not installed in John Doe's bedroom and bathroom. WCMHS also provides two staff members to assist John Doe at all times.

After John Doe moved into the Marshfield Home, Plaintiffs allege that WCMHS "consulted with autism and behavioral specialists and communication specialists" but that

4

Commissioner White terminated those contracts allegedly "without implementing the experts' recommendations." *Id.* at 9, ¶ 44. One of these terminated contracts was with expert autism consultant, Kate Panaccione, Ed.D., who was "under contract to serve [John] Doe pursuant to a stipulated court order in the guardianship matter in the Civil Division of the Vermont Superior Court." *Id.* ¶ 45. Plaintiffs allege that on May 15, 2021, Ms. Panaccione submitted "a report of abuse and neglect to DAIL based on her observations of the services provided to [John] Doe by WCMHS." (Doc. 39-2 at 9, ¶ 45.) In alleged retaliation, Commissioner White, who reviewed the report, terminated the contract with Ms. Panaccione.

Plaintiffs allege that although a full calendar of events and appointments is part of John Doe's behavior support plan, WCMHS failed to arrange activities for him and his calendar is "mostly blank, even after repeated requests by Linda [Luxenberg] that WCMHS . . . take steps to fill [John] Doe's schedule." *Id.* ¶ 46. WCMHS also allegedly failed to provide John Doe with the tools he requires to communicate effectively with its staff. John Doe's "initial behavior support plan[,] . . . current support plan, and communication plan all recommend that communication should be in writing or visual[,]" but WCMHS and VCIN staff "often attempt[ed] to communicate with [John] Doe verbally, which impede[d] his ability to communicate and often frustrate[d] him." *Id.* at 10, ¶ 48.

Melmark conducted another evaluation of John Doe in August and September 2021 and allegedly concluded that his "ISA and behavior support plan were not being implemented." *Id.* ¶ 49. Melmark allegedly "noted failures by [John] Doe's staff to utilize nonverbal communication, the lack of an appropriate schedule, and consequential behavioral problems including deterioration of [John] Doe's ability to maintain basic hygiene, routine dysregulation, and troubling behaviors like spending the day pacing around the home." *Id.* Plaintiffs allege, upon information and belief, that the Melmark evaluation was reviewed by WCMHS, Ms. Moulton, Commissioner White, Director Garabedian, and other DAIL representatives. Despite the Melmark evaluation, Plaintiffs allege that neither WCMHS nor DAIL made changes to John Doe's program.

5

In January 2022, John Doe "experienced severe behavioral dysregulation[] during which he became physically aggressive" and was taken to the emergency department at Central Vermont Medical Center. *Id.* ¶ 51. He was cleared for discharge within twenty-four hours but "remained in the ED for approximately one week before WCMHS allowed him back to the Marshfield [H]ome" apparently "due to the lack of a safe place for him to return[.]" (Doc. 39-2 at 11, ¶ 52.) Plaintiffs allege that the reason why John Doe "was not able to return to Marshfield immediately upon being medically cleared was because WCMHS refused to promptly allow it." *Id.* ¶ 53.

Thereafter, WCMHS contacted Linda and Kelcey Luxenberg and advised them that John Doe would be reevaluated in approximately six months, but Plaintiffs allege that "no reevaluation has been completed since the . . . ISA became effective in February of 2022." *Id.* at 12, ¶ 60. John Doe's ISA from February 1, 2022 until January 30, 2023 stated that: "WCMHS [would] maintain oversight of the residence and support staff; monitor Medicaid services and help as needed; coordinate with a [r]egistered [n]urse regarding medication administration oversight; research and coordinate services of a clinical autism specialist and speech-language pathologist; coordinate a sensory evaluation; and coordinate additional services as needed." *Id.* at 11, ¶ 55. Plaintiffs allege that, contrary to the ISA, WCMHS did not provide or obtain these services. They further state that WCMHS "failed to provide enough staff members, and those assigned to assist [John] Doe have been inadequately trained and made basic errors like allowing [John] Doe to stray from their physical proximity, endangering him." *Id.* ¶ 56.

They contend that shortcomings in John Doe's services were discussed at team meetings that included WCMHS representatives, DAIL, Director Garabedian, VCIN staff, and others. They allege that DAIL knew that John Doe was not receiving services and supports as required by his ISA.

The ISA purportedly states that staff members will support John Doe in engaging in community and relationship-building, but this has allegedly not taken place. Plaintiffs allege that WCMHS has not provided John Doe with a case manager and that Ms. Moulton has taken no steps to rectify this. Plaintiffs allege that WCMHS's failures to

provide services pursuant to the ISA placed John Doe at an increased risk of
institutionalization.

In August 2020, Linda Luxenberg's guardianship was terminated and the Office of
the Public Guardian, which is a DAIL division, was appointed as John Doe's guardian
allegedly because Linda Luxenberg expressed concerns that the VCIN crisis bed was not
a safe placement for him. In May 2021, guardianship was transferred from the Public
Guardian to John Doe's aunt and his sister Kelcey Luxenberg. On August 2, 2022, Linda
Luxenberg was reappointed co-guardian with Kelcey Luxenberg in place of John Doe's
aunt. Since August 2, 2022, Plaintiffs allege that John Doe's co-guardians "have made
efforts . . . to obtain necessary services for [John] Doe[,] including by transferring his
services" to a provider other than WCMHS. *Id.* at 14, ¶ 72.

On September 7, 2022, Linda Luxenberg, WCMHS, John Doe's Guardian ad
Litem, and "other advocates" met to discuss John Doe's transfer from the Marshfield
Home. (Doc. 39-2 at 14, ¶ 73.) Keith Grier of WCMHS stated he had spoken with the
Executive Director of LCMHS about the possibility of LCMHS providing services for
John Doe.

LCMHS told John Doe's guardians on September 9, 2022 that "it was short-
staffed and unable to provide [John] Doe with adequate services." *Id.* at 15, ¶ 77. His
guardians then identified a number of potential individuals willing to work with him and
provided WCMHS, LCMHS, and DAIL with a list of names, but their suggestions were
allegedly ignored.

Another meeting took place on September 21, 2022 to discuss John Doe's
transition from the Marshfield Home to Lamoille County, and the meeting attendees
"agreed that LCMHS and DAIL should be involved in planning any transition to
Lamoille." *Id.* at 14, ¶ 74. The following day, John Doe's guardians, through counsel,
"sent out meeting notes and copied [Director] Garabedian," identifying questions "that
needed to be answered by DAIL to make progress on [the] transition." *Id.* Plaintiffs
allege that between September 7 and September 21, 2022, no progress was made. On
September 27, 2022, an unidentified WCMHS employee allegedly stated "DAIL's lack

7

of involvement was impeding the transfer of [John] Doe's services[.]" *Id.* ¶ 76.

Plaintiffs contend that on or around September 27, 2022, their counsel spoke to the General Counsel of DAIL, Stuart Schurr, about planning John Doe's transition. Plaintiffs' counsel then sent Attorney Schurr a draft transition proposal, but DAIL did not respond to the draft plan until October 4, 2022. DAIL allegedly stated that it was "concerned that [the draft proposal] fails to identify many of the essential components necessary for a meaningful conversation regarding [John Doe's] transition from one community-based program to another[.]" *Id.* at 16, ¶ 79. DAIL allegedly proposed no alternative method to facilitate John Doe's transition and stated that DAIL representatives "would not be a part of transition planning because that was not the role of the agency" but "they could approve plans and address conflicts as they arose." (Doc. 39-2 at 16, ¶ 80.)

On October 3, 2022, Ms. Moulton sent Plaintiffs an email with the subject line: "WCMHS Notice of Termination" and copied Commissioner White and Director Garabedian. In the email, Ms. Moulton allegedly stated that all WCMHS services would be terminated by November 3, 2022, because John Doe's "guardians had complained about WCMHS services[.]" *Id.* ¶ 81. Ms. Moulton additionally stated that WCMHS and DAIL would cooperate with transition planning, but did not explain in detail how. Plaintiffs allege that no additional information was provided and they were not advised of John Doe's due process or appeal rights.

Plaintiffs contend a termination of services will render John Doe homeless and endanger his safety. They assert that neither DAIL nor WCMHS have identified any justification for terminating John Doe's services other than Linda Luxenberg's objections. They also allege that Commissioner White and Director Garabedian were involved in the decision to terminate John Doe's services and that those defendants, as well as others at DAIL, knew of WCMHS's plan to terminate John Doe's services before the notice was sent to his guardians. Plaintiffs allege that these individuals "took no action to prevent the termination or ensure there was a plan for the transition." *Id.* at 17, ¶ 85.

On October 4, 2022, Attorney Schurr, on behalf of DAIL, emailed John Doe's

8

counsel stating, "while DAIL is available to provide support, as needed, it remains [DAIL's] expectation that the guardians will take the lead on the transition to an alternate community-based program, with WCMHS as the referring agency. Accordingly, DAIL has taken no steps to invite LCMHS to join tomorrow's discussion." *Id.* at 17, ¶ 88 (internal quotation marks omitted) (alteration in original). The next day, Linda Luxenberg met with representatives of DAIL, including Director Garabedian and Ms. Moulton. "DAIL agreed that [John] Doe should not be without shelter as of November 3, but offered no concrete plans for establishing services or housing elsewhere other than a possible crisis bed somewhere in Lamoille County" and "WCMHS had no suggestions for where [John] Doe will reside after [] November 3, nor who will provide services." *Id.* at 17-18, ¶ 89. The parties decided that John Doe's guardians, WCMHS, and LCMHS would meet and work towards a transition plan and submit either a plan or status update to DAIL by October 12, 2022.

Following the meeting on October 5, John Doe's guardians emailed WCMHS and LCMHS to schedule a transition plan meeting. They also provided a draft transition proposal. Plaintiffs allege that "neither WCMHS nor LCMHS have agreed to a meeting" to discuss their proposal. *Id.* at 18, ¶ 90.

On October 7, 2022, John Doe's counsel filed an appeal of the WCMHS termination decision with the Vermont Human Services Board (the "VHS Board") and requested that John Doe's services remain in place in the interim. The appeal was sent to both DAIL and WCMHS, but Plaintiffs allege that WCMHS never responded and that DAIL responded only by filing a motion to dismiss. The VHS Board scheduled an initial status conference for November 4, 2022, and then after being reminded "that services and housing were to be terminated on November 3rd, and that a decision on the request for a stay was needed prior thereto," (Doc. 39-2 at 18, ¶ 92), it responded that "correspondence on that issue had been received but gave no indication that such a decision would be made before termination." *Id.* Plaintiffs allege that this exposed John Doe "to [a] substantial risk of irreparable harm." *Id.* at 19, ¶ 92.

On October 12, 2022, WCMHS, through counsel, "filed an unsolicited letter in

Washington County Superior Court – Probate Division[,]" the court in which John Doe's
guardianship has been adjudicated. *Id.* ¶ 93. That same day, LCMHS emailed John Doe's
guardians, as well as representatives from WCMHS, stating:

> We have been working away at getting further clarification from DAIL on
> the current services and what the program array is and could be for [John]
> Doe. As well we have been meeting with VCIN and WCMHS to determine
> what has been successful from their perspective. Thus, we have been in a
> collection mode to respond to the myriad of concerns and ideas in the
> document you sent. By the end of the day I will be forwarding to you a
> response of what we are hoping will move us all to a clear and useful plan
> for success in the next months ahead.

*Id.* ¶ 95 (emphasis omitted). Upon information and belief, Plaintiffs allege that Director
Garabedian "is one of the individuals from DAIL referenced in LCMHS's
email . . . [who] was providing information to LCMHS regarding [John] Doe's services."
*Id.* at 20, ¶ 96.

Plaintiffs allege that as John Doe's guardians, through counsel, they replied with
suggestions of times to meet but that they received no reply. They assert that "DAIL is
influencing LCMHS's non-response and hampering their ability to provide services—and
a home—for [John] Doe." (Doc. 39-2 at 20, ¶ 99.)

On October 17, 2022, DAIL filed a motion in Probate Court to remove Linda and
Kelcey Luxenberg as John Doe's guardians and to have DAIL appointed as his guardian
because Linda Luxenberg was "not working well with [John Doe's] service providers."
*Id.* ¶ 100. Plaintiffs allege that DAIL and WCMHS "have continued to criticize and
antagonize Linda and Kelcey [Luxenberg] and seek removal of their guardianship over
[John] Doe." *Id.* ¶ 103. These efforts have allegedly continued "even after the [October
27, 2022] Stipulated Court Order in this case requiring the [p]arties to work together in
good faith." *Id.* at 21, ¶ 105.

Following the court's Stipulated Court Order, LCMHS took over John Doe's
Medicaid Waiver and became the lead agency providing him with services. As of the date
of Plaintiffs' motion to amend the Complaint, Plaintiffs allege that WCMHS continues to
provide staff and services to John Doe, that John Doe remains in the Marshfield Home,

and that WCMHS continues to support LCMHS in providing services to him. Plaintiffs allege that communication between them and LCMHS remains challenging.

Asserting that there are "no long-term plan[s] in place to provide services or alternate housing for [John] Doe[,]" *id.* at 20, ¶ 102, and that John Doe "suffered and is likely to suffer immediate, irreparable harm due to Defendants' acts and omissions[,]" *id.* at 25, ¶ 120, Plaintiffs have renewed their request for injunctive relief, which is currently pending before this court.

## II.    Conclusions of Law and Analysis.

The DAIL Defendants seek dismissal of Plaintiffs' ADA (Count IV), VFHPA (Count V), negligence (Count VI), retaliation (Count VII), and free speech (Count VIII) claims against them pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction because the Eleventh Amendment bars these claims. In addition, the DAIL Defendants argue that Linda Luxenberg lacks standing to bring claims against the DAIL Defendants and because 42 U.S.C. § 1983 does not give federal courts jurisdiction over state officials acting in an official capacity. They contend Commissioner White has absolute immunity from Plaintiffs' federal and state claims.

Pursuant to Fed. R. Civ. P. 12(b)(6), the DAIL Defendants request dismissal of all claims against them for failure to state a claim because neither the Complaint nor the AC "specifies how DAIL, Commissioner White[,] or Director Garabedian are involved or otherwise responsible for WCMHS's decision" to terminate John Doe's care. *Id.* at 6. They seek dismissal of Plaintiffs' procedural and Medicaid due process claims (Counts I and II) because they are "founded on a conclusory claim that [P]laintiffs have been denied process[,]" *id.*; and dismissal of Plaintiffs' RA and ADA claims (Counts III and IV) because they "do not contain sufficient allegations of failures to accommodate or acts of discrimination, but rather consist of allegations regarding the level of services provided." *Id.*

11

### A.    Standard of Review.

To withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6),[1] "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (internal citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not judge credibility, "weigh the evidence[,]" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

### B.    Whether the DAIL Defendants Are Entitled to Sovereign Immunity.

"[T]he Eleventh Amendment goes to the jurisdiction of the federal court, as

---

[1] Although the parties cite Fed. R. Civ. P. 12(b)(1) when addressing the DAIL Defendants' Eleventh Amendment challenges to this court's jurisdiction, the more appropriate standard of review is Fed. R. Civ. P. 12(b)(6). *See Barrette v. Vill. of Swanton*, 2023 WL 3891034, at *7 (D. Vt. June 6, 2023) ("While Eleventh Amendment immunity is jurisdictional, it is not coextensive with the limitations on judicial power in Article III . . . . In accordance with the approach taken by other district courts within the Second Circuit, the court applies the stricter standard under Rule 12(b)(6) in assessing Defendants' Eleventh Amendment immunity arguments.") (alterations adopted) (internal quotation marks and citations omitted).

opposed to the underlying liability of the State or state entity." *NAACP v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019) (internal quotation marks and citations omitted). It provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State," the Supreme Court has "extended the Amendment's applicability to suits by citizens against their own States." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

"The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Id.* "Without a State's express waiver or an act by Congress under Section 5 of the Fourteenth Amendment, the Eleventh Amendment bars federal courts from adjudicating claims against a State, as well as its agencies and agents." *74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)). "The only exception exists for claims for prospective relief against state officials in their official capacities" for violations of federal law. *Id.* (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)). "*Young* . . . [is] inapplicable in a suit against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

The State of Vermont has not waived its sovereign immunity in federal court in the facts and circumstances of this case. *See* 12 V.S.A. § 5601(g) ("Nothing in this chapter waives the rights of the State under the Eleventh Amendment of the U.S. Constitution."); *see also Pennhurst State Sch. & Hosp.*, 465 U.S. at 100 ("It is clear[] . . . that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant[, a suit in federal court] is proscribed by the Eleventh Amendment."). Accordingly, the court addresses the DAIL Defendants' sovereign immunity challenges to Counts IV, V, VI, VII, and VIII first.

### 1.    Whether the DAIL Defendants Are Entitled to Sovereign Immunity for Plaintiffs' ADA Claim (Count IV).

In asserting their ADA claim, Plaintiffs seek "damages adequate to compensate Plaintiff[s] for harm suffered from Defendant[s'] unlawful actions[.]" (Doc. 39-2 at 34, ¶ 5.) The DAIL Defendants argue the Eleventh Amendment precludes an award of monetary damages absent intentional discrimination. The court agrees.

In Title II of the ADA, Congress exercised its authority pursuant to Section 5 of the Fourteenth Amendment to abrogate state sovereign immunity for certain monetary claims. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 111 (2d Cir. 2001). The Second Circuit has held, however, that "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability[.]" *Id.* at 112; *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) ("The law is well settled that intentional violations of Title VI, and thus the ADA and the Rehabilitation Act, can call for an award of money damages."). "The standard for intentional violations is 'deliberate indifference to the strong likelihood of a violation[.]'" *Loeffler*, 582 F.3d at 275.

"To prove 'intentional discrimination' under the ADA, a plaintiff must allege facts showing that a policymaker acted with ill will or personal animosity toward him because of his disability or that the policymaker acted with 'deliberate indifference' to his rights under the ADA." *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 187 (E.D.N.Y. 2015). A "plaintiff demonstrates deliberate indifference in the Title II context where an 'official with authority to address the alleged discrimination and to institute corrective measures on [p]laintiff's behalf had actual knowledge of ongoing discrimination against [p]laintiff but failed to respond adequately.'" *Gershanow v. Cnty. of Rockland*, 2014 WL 1099821, at *4 (S.D.N.Y. Mar. 20, 2014).

Plaintiffs allege that DAIL created, funds, and supervises the Marshfield program and that DAIL reviewed the 2021 Melmark evaluation of John Doe and was thus aware of WCMHS staff's failure to "utilize nonverbal communication, the lack of an

14

appropriate schedule, and consequential behavioral problems including deterioration of
[John] Doe's ability to maintain basic hygiene, routine dysregulation, and troubling
behaviors like spending the day pacing around the home." (Doc. 39-2 at 10, ¶ 49.) They
assert that because DAIL and WCMHS failed to make changes to the Marshfield
program, John Doe was transported to the emergency department in January 2022.
Plaintiffs further allege that DAIL has "continued to criticize and antagonize Linda and
Kelcey [Luxenberg] and seek removal of their guardianship over Doe" and that DAIL has
continued its "efforts to oppose [Linda Luxenberg's] advocacy and participation in her
son's treatment and communications[.]" *Id.* at 20-21, ¶¶ 103, 105.

Although Plaintiffs plausibly allege that DAIL acted with ill will or personal
animosity toward Linda and Kelcey Luxenberg, they fail to plausibly allege that DAIL
intentionally discriminated against *John Doe* on the basis of his disability. For this
reason, monetary damages for their ADA claim are barred by the Eleventh Amendment
because they fail to plausibly allege intentional discrimination.

The court thus GRANTS the DAIL Defendants' motion to dismiss that part of
Plaintiffs' ADA claim that seeks monetary damages against them (Count IV).

### 2. Whether the DAIL Defendants Are Entitled to Sovereign Immunity for Plaintiffs' VFHPA Claim (Count V).

Plaintiffs agree with the DAIL Defendants "that this claim is barred in this court
against DAIL pursuant to the Eleventh Amendment" and thus Plaintiffs do "not address
the remaining arguments." (Doc. 99 at 20.) The court therefore GRANTS the DAIL
Defendants' motion to dismiss Plaintiffs' VFHPA claim against them (Count V). Because
this claim is dismissed by consent, the court does not address the DAIL Defendants'
further argument that Linda Luxenberg lacks standing to bring this claim.

### 3. Whether the DAIL Defendants Are Entitled to Sovereign Immunity for Plaintiffs' Negligence Claim (Count VI).

The DAIL Defendants seek dismissal of Plaintiffs' negligence claim against
Commissioner White and Director Garabedian in their official capacities because the
Eleventh Amendment bars a state law claim for monetary damages. Plaintiffs concede
that both Commissioner White and Director Garabedian are entitled to Eleventh

Amendment immunity in their official capacities. *See Brown v. New York*, 975 F. Supp.
2d 209, 226 (N.D.N.Y. 2013) ("The Eleventh Amendment bars suits in federal courts
seeking relief, whether prospective or retroactive, against state officials for their alleged
violations of state law. . . . The *Ex parte Young* doctrine is inapplicable where the
officials are alleged to have violated state law."). To the extent the AC sets forth such a
claim, it is DISMISSED. Plaintiffs argue, however, that Commissioner White and
Director Garabedian remain liable for negligence in their individual capacities because
their actions were "ultra vires[.]" (Doc. 99 at 20.)

Because "'[a]n [a]ction of an officer of the sovereign . . . that is beyond the
officer's statutory authority is not action of the sovereign, a suit for specific relief against
the officer is not barred by the Eleventh Amendment.'" *Brown*, 975 F. Supp. at 227
(quoting *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 696-97 (1982)). As
the Supreme Court explained:

> There may be . . . suits for specific relief against officers of the sovereign
> which are not suits against the sovereign. *If the officer purports to act as an
> individual and not as an official*, a suit directed against that action is not a
> suit against the sovereign. . . . On a similar theory, *where the officer's
> powers are limited by statute, his actions beyond those limitations* are
> considered individual and not sovereign actions. The officer is not doing
> the business which the sovereign has empowered him to do or he is doing it
> in a way which the sovereign has forbidden. His actions are ultra vires his
> authority and therefore may be made the object of specific relief. It is
> important to note that in such cases the relief can be granted, without
> impleading the sovereign, *only because of the officer's lack of delegated
> power*. A claim of error in the exercise of that power is therefore not
> sufficient.

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689-90 (1949) (emphasis
supplied). "[A] state officer may be said to act *ultra vires* only when he acts 'without any
authority whatever.'" *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101 n.11 (quoting
*Treasure Salvors, Inc.*, 458 U.S. at 697).

In their opposition to the DAIL Defendants' motion to dismiss, Plaintiffs argue
that "[Commissioner] White and [Director] Garabedian acted outside the scope of their
roles when they encouraged the lack of services to [John] Doe and encouraged the

16

2:22-cv-00188-cr    Document 196    Filed 10/13/23    Page 17 of 30

termination of his services." (Doc. 99 at 20.) The AC, however, does not contain this allegation, nor does it allege that either Commissioner White or Director Garabedian acted "in a way which the sovereign has forbidden" in the provision of services to John Doe. *Larson*, 337 U.S. at 689. Although, Plaintiffs allege that the DAIL Defendants "took no action to prevent the termination [of John Doe's services] or ensure there was a plan for the transition[,]" (Doc. 39-2 at 17, ¶ 85), these allegations "claim [an] error in the exercise of" Commissioner White's and Director Garabedian's delegated power, not an ultra vires claim. *Larson*, 337 U.S. at 690 (explaining that ultra vires actions are permitted "only because of the officer's lack of delegated power").

Because Plaintiffs identify no negligent acts or omissions undertaken by the DAIL Defendants in their individual capacities that were ultra vires, the court GRANTS the DAIL Defendants' motion to dismiss Plaintiffs' negligence claim (Count VI) against Commissioner White and Director Garabedian.

### 4.    Whether the DAIL Defendants Are Entitled to Sovereign Immunity for Plaintiffs' Retaliation Claim (Count VII).

The DAIL Defendants seek dismissal of Plaintiffs' retaliation claim against them[2] because Vermont has not waived its sovereign immunity. Plaintiffs counter that Commissioner White, in her individual capacity, is not shielded by the Eleventh Amendment because "using the decision to terminate [John] Doe's services, which was for the sole reason of WCMHS's frustrations with the guardian[]s voicing concerns, as a basis to terminate [John] Doe's guardians [was] outside the scope of Defendants' statutory authority." (Doc. 99 at 22.)

Commissioner White is alleged to have provided "approval" to WCMHS and DAIL to file pleadings in Probate Court seeking to remove them. (Doc. 39-2 at 32, at ¶ 161.) The AC asserts that "DAIL and WCMHS have continued to criticize and antagonize Linda and Kelcey [Luxenberg] and seek removal of their guardianship" at the

---

[2] The AC does not assert a retaliation claim against Director Garabedian. *See* Doc. 39-2 at 32-33, ¶¶ 158-63. Plaintiffs also do not allege an official capacity claim against either Commissioner White or Director Garabedian.

direction of Commissioner White and Ms. Moulton. *Id.* at 20-21, ¶ 103. DAIL's "primary argument [for removing Linda and Kelcey Luxenberg as guardians] is that Linda [Luxenberg] is not working well with [John Doe]'s service providers[,]" *id.* at 20, ¶ 100, including "[Linda Luxenberg's] filing of grievances, criticizing Defendant[s'] services and care, and requesting services (or the assurance of future services)." *Id.* at 20-21, ¶ 103. Plaintiffs contend these retaliatory acts violated 18 V.S.A. § 8728(b), which states: "Every family that receives services has the right to . . . [b]e free from retaliation for making a complaint, voicing a grievance, recommending a change in policy, or exercising a legal right." *Id.* at 32, ¶¶ 159-61.

Because the basis of their retaliation claim is a violation of state law, Plaintiffs may not seek monetary relief or prospective injunctive relief against Commissioner White in her official capacity in federal court. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 106 ("[A] federal court instruct[ing] state officials on how to conform their conduct to state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

To the extent the AC asserts that Commissioner White directed others to initiate guardianship modification proceedings in response to Linda Luxenberg's complaints, whether she was acting in her official or individual capacity turns on the scope of her authority as DAIL's Commissioner. Although the parties do not dispute that Commissioner White has the statutory authority to initiate guardianship proceedings for adults with developmental disabilities in certain circumstances, the AC alleges that Commissioner White has done so solely in retaliation against Plaintiffs for making complaints about John Doe's services. Vermont law does not authorize the exercise of official power in this manner. *See Larson*, 337 U.S. at 689 (explaining that officer's actions are considered individual where she exercises authority "in a way which the sovereign has forbidden"); *see also* 18 V.S.A. § 8728(b)(4). The AC thus plausibly alleges that Commissioner White acted outside the scope of her authority in seeking to retaliate against Plaintiffs for complaining about services provided to John Doe.

For the reasons stated above, the court DENIES the DAIL Defendants' motion to dismiss Plaintiffs' retaliation claim (Count VII) insofar as it relates to Commissioner White's individual liability for allegedly directing the initiation of guardianship modification proceedings to remove Plaintiffs as John Doe's guardians for retaliatory purposes.

### 5.    Whether Commissioner White Is Entitled to Absolute Immunity Under State Law for Plaintiffs' Retaliation Claim.

If sovereign immunity is not available, the DAIL Defendants argue that Commissioner White has absolute immunity from state law claims against her in her individual capacity because the DAIL Commissioner is one of the highest executives in state government. Plaintiffs respond that Commissioner White is not entitled to immunity because she acted outside the scope of her authority when she sought to remove John Doe's guardians.

The Vermont Supreme Court has gone "to considerable lengths . . . to distinguish Vermont common-law immunity applicable to state law claims from the federal immunity doctrine applicable to § 1983 claims." *O'Connor v. Donovan*, 2012 VT 27, ¶ 16, 191 Vt. 412, 422, 48 A.3d 584, 590 (observing that federal immunity law requires a "different analysis altogether"). "The absolute immunity doctrines under federal law and Vermont law may therefore yield divergent outcomes." *Leise v. Vt. Hum. Rts. Comm'n*, 2023 WL 2633341, at *15 (D. Vt. Mar. 24, 2023).

Under Vermont law, "[a]bsolute immunity shields judges, legislators and the state's highest executive officers in cases where the acts complained of were performed within their respective authorities." *Levinsky v. Diamond*, 559 A.2d 1073, 1078 (Vt. 1989), *overruled on other grounds by Muzzy v. State By & Through Rutland Cnty. State's Att'y*, 583 A.2d 82 (Vt. 1990). "When available, absolute immunity applies to any and all acts performed within the individual's authority." *Id.*

Commissioner White, as Commissioner of DAIL, has authority to "administer all laws and programs specifically assigned to [DAIL] for administration," 33 V.S.A. § 504(a), and is tasked with "ensur[ing] coordination of government and private services

19

directed at providing assistance to . . . persons with disabilities." *Id.* § 504(b).[3] The Vermont Supreme Court has consistently held that executive department heads are "highest executive officers." *See LaShay v. Dep't of Soc. & Rehab. Servs.*, 625 A.2d 224, 227 (Vt. 1993) ("Because defendant [Commissioner] is the highest executive officer at [the Department of Social and Rehabilitation Services], he is entitled to absolute immunity, if he was acting within the scope of his authority."); *Curran v. Marcille*, 565 A.2d 1362, 1363 (Vt. 1989) (holding Commissioners of Department of Motor Vehicles and Department of Corrections are entitled to absolute immunity); *Levinsky*, 559 A.2d at 1079 (ruling Commissioner of Department of Social Welfare is entitled to absolute immunity). As one of "the state's highest executive officers[,]" Commissioner White has absolute immunity for "any and all acts performed within [her] authority." *Levinsky*, 559 A.2d at 1078.

Although Plaintiffs argue that Commissioner White had ulterior motives in seeking the removal of John Doe's guardians, this does not alter her absolute immunity under Vermont law for a state law retaliation claim provided she was acting within the scope of her authority. *See O'Connor*, 2012 VT 27, ¶ 27, 191 Vt. at 428, 48 A.3d at 594 ("That defendant was allegedly motivated by ill will . . . does not diminish the absolute immunity afforded conduct otherwise within the general scope of defendant's authority."); *Levinsky*, 559 A.2d at 1080 n.3 (noting that where state actor is protected by absolute immunity, "motive is irrelevant"). The AC presents a close question of Vermont law. Although Commissioner White was involved in an action she is authorized to

---

[3] DAIL may also initiate, terminate, or seek to modify public guardianship proceedings and act as a guardian. *See* 18 V.S.A. § 9305 (petition for public guardianship); *id.* § 9313 (duties when Commissioner serves as guardian); *id.* § 9316 (modification or termination of public guardianship). Where a ward is under the guardianship of a private person, DAIL may seek a termination or modification. *See* 14 V.S.A. § 3077(a) ("[A]ny person interested in the welfare of the person under guardianship may file a motion for termination or modification of the guardianship."); *id.* § 3093 ("[T]he Office of Public Guardian through its designees shall . . . [b]e considered a person interested in the welfare of the ward for purposes of filing a motion under section 3077 of this title for termination or modification of guardianship."). Grounds for termination or modification of a private guardianship include "a change in the capacity or suitability of the guardian for carrying out his or her powers and duties[.]" *Id.* § 3077(a)(5).

undertake, she is not entitled to use her authority for retaliatory purposes. *See* 18 V.S.A. § 8728(b)(4). Viewing the AC in the light most favorable to Plaintiffs, the court cannot determine, as a matter of law, that Commissioner White is entitled to absolute immunity. Dismissal of Plaintiffs' retaliation claim at the pleadings stage is therefore premature and must await a factual record. *See Leise*, 2023 WL 2633341, at *19 (collecting cases for proposition that "the question of absolute immunity must remain undecided until a factual record is established" where court cannot determine as matter of law whether executive officials acted within scope of authority).

The court therefore DENIES the DAIL Defendants' motion to dismiss Plaintiffs' state law retaliation claim (Count VII) against Commissioner White in her individual capacity on the grounds of absolute immunity.

### 6. Whether the DAIL Defendants Are Entitled to Sovereign Immunity for Plaintiffs' First Amendment Claim (Count VIII) Pursuant to 42 U.S.C. § 1983.

The DAIL Defendants request dismissal of Plaintiffs' First Amendment claim against Commissioner White because the Eleventh Amendment bars suit against state officials acting in their official capacities. Plaintiffs oppose dismissal, arguing that they seek prospective injunctive relief against Commissioner White and Director Garabedian[4] in their official capacities and money damages against them in their individual capacities only. (Doc. 39-2 at 34, ¶ 5.)

"Under the well-known exception to" Eleventh Amendment immunity "set forth in *Ex parte Young*, . . . 'a plaintiff may sue a state official acting in his official capacity— notwithstanding the Eleventh Amendment—for prospective[] injunctive relief from violations of federal law.'" *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal citations omitted) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007)). In addition, "the Eleventh Amendment does not prohibit an action for money damages, whether compensatory or punitive, against a state official in

---

[4] The AC does not assert a First Amendment claim against Director Garabedian. *See* Doc. 39-2 at 33, ¶¶ 164-68. There is thus no need to dismiss this claim.

his individual capacity." *Shane v. Connecticut*, 821 F. Supp. 829, 832 (D. Conn. 1993).
Accordingly, the Eleventh Amendment does not bar Plaintiffs' § 1983 claims to the
extent they seek prospective injunctive relief for violations of federal law and to the
extent they seek to impose individual liability.

The AC asserts that Commissioner White's "ongoing legal campaign to terminate
the guardianship of [John] Doe . . . in response to criticism, complaints or grievances
related to [John Doe's] services and housing chills and prevents speech" in violation of
Plaintiffs' First Amendment rights. (Doc. 39-2 at 33, ¶¶ 165-66.) Although the AC
requests "injunctive relief and damages" for the free speech violation, *id.* ¶ 167, it does
not specify the prospective injunctive relief Plaintiffs seek. At the pleadings stage, a
request for injunctive relief need not be specific. *See Verizon Md. Inc. v. Pub. Serv.
Comm'n of Md.*, 535 U.S. 635, 645 (2002) ("In determining whether the doctrine of *Ex
parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a
'straightforward inquiry into whether [the] complaint alleges an ongoing violation of
federal law and seeks relief properly characterized as prospective.'") (quoting *Idaho v.
Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in
part and concurring in judgment)) (alteration in original).

To the extent Plaintiffs seek monetary relief from Commissioner White in her
individual capacity and seek to prospectively enjoin her in her official capacity for a
violation of their First Amendment rights, the Eleventh Amendment does not bar their
claims. As a result, the DAIL Defendants' motion to dismiss Plaintiffs' individual
capacity and prospective injunctive relief claims against Commissioner White on
Eleventh Amendment grounds is DENIED.

For the reasons stated above, the DAIL Defendants' motion to dismiss Count VIII
is thus GRANTED on Eleventh Amendment grounds to the extent it alleges an official
capacity claim against Commissioner White for monetary damages. It is DENIED to the
extent Plaintiffs assert an individual capacity claim for monetary damages and an official

22

capacity claim for prospective injunctive relief.[5]

### 7.    Whether Commissioner White Is Entitled to Absolute Immunity for Plaintiffs' First Amendment Claim.

The DAIL Defendants argue Commissioner White is entitled to absolute immunity under federal law for her alleged First Amendment violation because her actions were prosecutorial in nature. The Supreme Court has recognized that "some officials perform 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993). "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 269 (alteration adopted) (internal quotation marks omitted) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). The Court "ha[s] been 'quite sparing' in recognizing absolute immunity for state actors" and considers whether § 1983's "history or purposes . . . counsel against recognizing" absolute immunity, even when the Court "can identify a common-law tradition of absolute immunity for a given function[.]" *Id.* It has concluded that the "common-law rule of immunity" for prosecutors was "well-settled" and that the "same considerations of public policy that underlie the common-law rule likewise countenance absolute immunity under [§] 1983." *Imbler v. Pachtman*, 424 U.S. 409, 424 (1976).

In contrast, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at

---

[5] The DAIL Defendants additionally argue that Plaintiffs cannot maintain their free speech claim against Commissioner White in her official capacity because the government is not a "person" under 42 U.S.C. § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983[,]" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), except, "a state official in his or her official capacity, when sued for injunctive relief, [is] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at 71 n.10. Because Plaintiffs seek prospective injunctive relief against an official whom they allege used her office to direct guardianship modification proceedings in retaliation against Plaintiffs for their exercise of their free speech rights, their First Amendment claim is cognizable under § 1983.

273. In other words, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity 'represents the norm' for executive officers, . . . so when a prosecutor 'functions as an administrator rather than as an officer of the court[,]' he is entitled only to qualified immunity." *Id.* (internal citations omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 340 (1986)).

The Supreme Court has explained that:

> The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought. . . . The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete.

*Butz v. Economou*, 438 U.S. 478, 515 (1978).

Applying *Butz*, the Second Circuit has held that a state attorney general's intrusion into a patient's medical care after the initiation of guardianship proceedings was not akin to an "act in a prosecutorial capacity" and therefore the defendants were "not entitled to absolute immunity[.]" *Blouin ex rel. Est. of Pouliot v. Spitzer*, 356 F.3d 348, 357-58 (2d Cir. 2004). As the Second Circuit observed, guardianship proceedings are not criminal and do not require the state attorney general to "act in a prosecutorial capacity." *Id.* at 358. As a result, "[i]n seeking the appointment of a guardian[,]" the attorney general was not "engaged as [an] advocate[] for the state in adversarial proceedings, at least in the traditional sense[,]" because the "principal objective was the protection of [the individual's] well-being." *Id.*

The AC alleges that DAIL and Commissioner White directed the "ongoing legal campaign to terminate the guardianship of [John] Doe in response to appropriate advocacy on his behalf[.]" (Doc. 39-2 at 33, ¶ 165.) Initiating a proceeding to appoint a new guardian is arguably the functional equivalent of a proceeding to appoint a guardian, which was at issue in *Butz*. In light of the Supreme Court's tradition of granting absolute immunity "quite sparing[ly,]" *Buckley*, 509 U.S. at 269 (internal quotation marks

24

omitted), the DAIL Defendants have not sustained their burden of establishing that a motion to modify a guardianship[6] is a "prosecution" or a prosecutorial function. *See id.* (placing burden on government official seeking absolute immunity to establish that function at issue was prosecutorial in nature).

For the reasons stated above, the court DENIES the DAIL Defendants' request to dismiss Plaintiffs' First Amendment claim (Count VIII) against Commissioner White in her individual capacity because she is not entitled to absolute immunity.

### C.    Whether Plaintiffs Plausibly Plead their Procedural Due Process Claim (Count I) Against Commissioner White and Director Garabedian Pursuant to 42 U.S.C. § 1983.

Section 1983 "is not itself a source of substantive rights" but provides "a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A § 1983 claimant must allege the violation or deprivation was committed by a person acting "under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful[.]'") (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "To state a Due Process claim, a plaintiff must show that: (1) state action (2) deprived him or her of liberty or property (3) without due process of law." *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015); *see also In re Green Mountain*

---

[6] As Plaintiffs point out, the Vermont Attorney General filed the guardianship modification motion.

*Power Corp.*, 2012 VT 89, ¶ 77, 192 Vt. 429, 456-57, 60 A.3d 654, 674 (applying federal procedural due process test to state due process challenge).

"[P]rocedural due process protections ordinarily attach where state or federal law confers an entitlement to benefits." *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

"Due process . . . is a flexible concept that varies with the particular situation. To determine what procedural protections the Constitution requires in a particular case," *Zinermon v. Burch*, 494 U.S. 113, 127 (1990), a court must consider:

> the private interest that will be affected by the official action; . . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. "Applying this test, the Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127 (emphasis in original); *see also Martell v. City of St. Albans*, 441 F. Supp. 3d 6, 14 (D. Vt. 2020) ("It is well settled that due process generally requires notice and a hearing prior to an eviction.").

The AC alleges that Commissioner White and Director Garabedian violated John Doe's rights to due process under the Fourteenth Amendment to the United States Constitution and Article 4 of the Vermont Constitution (Count I) by approving the termination of his services without due process or a right of appeal. The AC does not allege, however, that such a termination actually took place; rather it was merely threatened. It thus does not plausibly allege a deprivation of a constitutional right. To the extent that Plaintiffs challenge the *quality* and *quantity* of services provided to John Doe, they do not plausibly allege these services were so substandard that they amount to a

deprivation of a constitutional magnitude.

Although Plaintiffs further allege that the VHS Board appeal did not qualify as adequate process because the Board "would not schedule any type of hearing or issue a stay until after [John] Doe's services had been terminated[,]" (Doc. 99 at 5) the AC inconsistently alleges that the VHS Board:

> scheduled the first Status Conference in the appeal for November 4, 2022—
> the day after the termination that will render him homeless and without
> support. When the [VHS Board] was reminded that services and housing
> were to be terminated on November 3rd, and that a decision on the request
> for a stay was needed prior thereto, the Board simply stated that the
> correspondence on that issue had been received but gave no indication that
> such a decision would be made before termination.

(Doc. 39-2 at 18, ¶ 92.) Plaintiffs concede that they have filed an appeal with and sought a stay from the VHS Board and that John Doe's services have not been terminated. *Id.* at 22, ¶ 108. The AC does not plausibly allege that the DAIL Defendants control the VHS Board. It is thus not clear what liberty or property interest Plaintiffs contend is at issue.

For the reasons stated above, the court GRANTS the DAIL Defendants' motion to dismiss Plaintiffs' procedural due process claim (Count I) against Commissioner White and Director Garabedian for failure to plausibly allege a due process violation.

**D.    Whether Plaintiffs Plausibly Plead a Medicaid Due Process Claim (Count II) Against Commissioner White and Director Garabedian Pursuant to 42 U.S.C. § 1983.**

Plaintiffs allege WCMHS "terminated" John Doe's Medicaid services, not Commissioner White or Director Garabedian. (Doc. 74 at 7.) "[A] state plan participating in Medicaid must 'provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied.'" *Davis v. Shah*, 821 F.3d 231, 239 (2d Cir. 2016) (quoting 42 U.S.C. § 1396a(a)(3)). "That requirement entails both written notice of any intended actions affecting a beneficiary's claim and an evidentiary hearing to contest denials of service." *Id.*

The AC does not allege that Director Garabedian or Commissioner White participated in the drafting of WCMHS's notice, nor does it plausibly allege they directed the termination of John Doe's Medicaid services which were not in fact terminated. The

court thus GRANTS the DAIL Defendants' motion to dismiss Plaintiffs' Medicaid due process claim (Count II) against Commissioner White and Director Garabedian.

> **E.    Whether Plaintiffs Plausibly Plead a RA Claim (Count III) and ADA Claim (Count IV) Against Commissioner White and Director Garabedian.**

The DAIL Defendants request that Plaintiffs' RA and ADA claims be dismissed because Plaintiffs fail to allege state action and because the AC does not allege discrimination based on John Doe's disability. Although the AC asserts that Director Garabedian and Commissioner White were "involved in the decision to terminate [John] Doe's services[,]" (Doc. 39-2 at 17, ¶ 84) this conclusory allegation is bereft of factual support. Elsewhere, the AC asserts that Director Garabedian and Commissioner White were merely "aware of" WCMHS's decision to terminate services.

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a) (emphasis supplied). This standard is similar to that imposed by the ADA, which states that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis supplied). Courts "treat claims under the two statutes identically in most cases." *Davis*, 821 F.3d at 259 (internal quotation marks omitted) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

To state a prima facie claim under either the RA or ADA, a plaintiff must allege "(1) that []he is a qualified individual with a disability; (2) that []he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to [his] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks and alterations omitted).

28

Plaintiffs argue that they have brought "six disability discrimination claims," (Doc. 99 at 9); however, the AC asserts only one RA claim (Count III) and one ADA claim (Count IV). The AC states that the DAIL Defendants have failed to ensure that John Doe receives necessary services pursuant to his ISA despite their awareness of WCMHS's failure to reasonably accommodate John Doe. (Doc. 39-2 at 27, ¶ 133.) It states that this failure to meaningfully act resulted in John Doe's isolation and increased risk of institutionalization.[7] *Id.* Plaintiffs also allege that the DAIL Defendants and other Defendants sought to terminate John Doe's services because of disagreements with his guardians. *Id.* at 28, ¶ 135. Plaintiffs do not, however, plausibly allege that the DAIL Defendants discriminated against John Doe *on the basis of his disability*, rather than because of their alleged retaliatory animus towards Linda and Kelcey Luxenberg. (Doc. 39-2 at 16, ¶ 81.) This is fatal to their RA and ADA claims.[8]

To the extent Plaintiffs allege that the DAIL Defendants breached a standard of care, RA and ADA claims do not lie on this basis. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999) ("We do not in this opinion hold that the ADA imposes on the States a standard of care for whatever medical services they render, or that the ADA requires States to provide a certain level of benefits to individuals with disabilities. We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.") (internal quotation marks and citation omitted). The court thus GRANTS the DAIL Defendants' motion to dismiss Plaintiffs' RA and ADA claims (Counts III-IV) against them.

---

[7] *See Davis v. Shah*, 821 F.3d 231, 263-64 (2d Cir. 2016) (recognizing disability discrimination claim under ADA where "defendant's actions pose a serious risk of institutionalization").

[8] *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . *shall, solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]") (emphasis supplied); 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.") (emphasis supplied).

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART the DAIL Defendants' motion to dismiss. (Doc. 74.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___13th___ day of October, 2023.

Christina Reiss, District Judge
United States District Court