

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2023 NOV -2  PM 1: 47

LINDA LUXENBERG and                  )
KELCEY LUXENBERG, as guardians       )
and next best friends of JOHN DOE;   )
LINDA LUXENBERG, for herself; and    )
JOHN DOE,                            )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )          Case No. 2:22-cv-00188
                                     )
VERMONT DEPARTMENT OF                )
DISABILITIES, AGING AND              )
INDEPENDENT LIVING; MONICA           )
WHITE, in her official and individual )
capacities; JENNIFER GARABEDIAN,     )
in her official and individual capacities; )
WASHINGTON COUNTY MENTAL             )
HEALTH SERVICES INC.; MARY           )
MOULTON, in her official and individual )
capacities; and LAMOILLE COUNTY      )
MENTAL HEALTH SERVICES, INC.,        )
                                     )
        Defendants.                  )

**OPINION AND ORDER
DENYING PLAINTIFFS' SECOND MOTION
FOR A PRELIMINARY INJUNCTION**
(Doc. 84)

Plaintiffs Linda Luxenberg and Kelcey Luxenberg, as guardians and next best

friends of John Doe; Linda Luxenberg, individually; and John Doe ("Plaintiffs") bring

this action against Defendants Vermont Department of Disabilities, Aging and

Independent Living ("DAIL"); Monica White ("Commissioner White"), in her individual

capacity and her official capacity as the Commissioner of DAIL; Jennifer Garabedian

("Director Garabedian"), in her individual capacity and her official capacity as the

Director of DAIL's Developmental Disabilities Services Division; Washington County

Mental Health Services, Inc. ("WCMHS"); Mary Moulton, in her individual capacity and her capacity as the Executive Director of WCMHS; and Lamoille County Mental Health Services, Inc. ("LCMHS") (collectively, "Defendants"). In their Amended Complaint, Plaintiffs seek declaratory and injunctive relief arising out of Defendants' alleged termination of mental health services for John Doe without Plaintiffs' consent, failure to develop a transition plan of services for John Doe, and failure to provide funding for an appropriate placement for him.

On October 18, 2022, Plaintiffs filed their initial motion for a preliminary injunction, which sought to prevent Defendants from terminating John Doe's services and unilaterally moving him out of the Marshfield home without the consent of his guardians. Plaintiffs also sought a preliminary injunction requiring Defendants to work on a transfer of services to an appropriate placement for John Doe. On October 27, 2022, the parties stipulated that they would work in good faith to develop a transition plan for John Doe and that he would remain in the Marshfield home until a plan was implemented. On December 6, 2022, the parties stipulated to continue working on a plan for long-term services and to continue to provide services to John Doe in the interim. The court adopted both stipulations as orders of the court at the parties' request.

On May 2, 2023, Plaintiffs filed a second motion for a preliminary injunction. The court held an evidentiary hearing on the motion for a preliminary injunction on July 13, 2023, and August 11, 2023.

Plaintiffs seek a preliminary injunction requiring Defendants LCMHS and DAIL to (1) implement the recommendations of Plaintiffs' expert, Joe Reichle, Ph.D.; (2) cooperate with John Doe's guardians to develop a transition plan to a satisfactory facility or program, even if the placement is outside of Vermont; (3) provide funding for the transition and establishment of services; (4) immediately work with Plaintiffs and Dr. Reichle to develop the programming and services John Doe needs while he remains at Marshfield; (5) ensure effective training for the staff working with John Doe; (6) develop adequate communication and behavior data tracking systems; (7) develop, implement, and provide an adequate communication plan for John Doe; and (8) grant other such

2

relief as is necessary.

Plaintiffs are represented by Zachary D. Hozid, Esq., and James A. Valente, Esq. DAIL, Commissioner White, and Director Garabedian are represented by Edward M. Kenney, Esq. WCMHS and Ms. Moulton are represented by Richard J. Windish, Esq., and Elizabeth A. Willhite, Esq. LCMHS is represented by Richard J. Windish, Esq., Elizabeth A. Willhite, Esq., and Bernard D. Lambek, Esq.

## I.    Whether Dr. Reichle is Qualified to Opine Regarding the Standard of Care.

Dr. Reichle has a bachelor of science degree from Kansas State University, a master's degree from Kansas State University, and a doctorate from the University of Wisconsin. He was an assistant and then a full professor at the University of Minnesota for approximately thirty-seven years and has been a professor emeritus there since 2018. He has provided technical assistance in creating behavioral and communication plans for approximately two hundred individuals with autism spectrum disorder ("ASD").

After he graduated from college, Dr. Reichle worked at the University of Vermont's Special Education Department for a year and a half as a visiting assistant professor. He has a friend who still works there. He has no knowledge of the standard of care in Vermont and does not opine that there is a national standard of care. He is unfamiliar with Vermont's statutory framework for providing services to individuals with disabilities, although he reviewed Vermont's statutory scheme between the court's two hearing dates. He hypothesizes that states have similar requirements so Vermont's standards may be similar to Minnesota's. He has no relevant knowledge of federal standards.[1]

Dr. Reichle has never personally examined John Doe. He has not reviewed his school records. He has not interviewed LCMHS's or WCMHS's staff. He has not spoken to Roland Luxenberg, John Doe's father, who sees John Doe on a weekly basis. He has

---

[1] Dr. Reichle's knowledge of federal statutes is confined to the Individuals with Disabilities Act that "applies to individuals up to the age of 23 years of age whose public school education has been extended." (Unofficial Transcript of Sept. 29, 2023 hearing at 75.) He agrees it does not apply to John Doe.

also not spoken to John Doe's guardians.

Based on the "very, very limited narrative report[s]," Dr. Reichle opined that John Doe's speech production, communication, and comprehension are that of a two- or three-year-old and his reading ability is at least the level of a six-year-old and is "qualitatively very limited." He notes that "[v]irtually no information about language comprehension skills were found in materials reviewed." (Doc. 84-1 at 18, ¶ 49.) Dr. Reichle has no opinion of John Doe's baseline intellectual capacity, nor does he have an opinion regarding whether John Doe is functioning at his baseline. He acknowledged that he did not know John Doe's degree of independence. He can point to no period in John Doe's life when his communication skills and behavior were markedly different than they are now.

Dr. Reichle bases his expert witness opinions on his review of John Doe's records and his review of the deposition of Mary Ellen Sudol of WCMHS (the "Sudol deposition"). He agrees that an in-person evaluation is necessary for him to render an opinion regarding the adequacy of John Doe's services:

> Q. Dr. Reichle, is it necessary to perform an evaluation of John Doe in a case like this?
>
> A. Yes, in my opinion.
>
> Q. How does it affect your ability to make an opinion or an assessment of the service provided, not your having personally assessed the individual?
>
> A. One can review the records, which is a good start, but following a review of records there should be specific assessments of both communication, augmentative communication and the behavior challenges that Mr. Doe has.

(Doc. 134 at 9.)

Dr. Reichle concedes that John Doe's Individual Support Agreement ("ISA") "meets minimal standards of an ISA" and "the guardian signed off on it[.]" He nonetheless criticizes the adequacy of WCMHS's and LCMHS's documentation of John Doe's activities and behavior and the lack of specificity which makes "it impossible to adequately monitor a rigorous plan of service for Mr. Doe[,]" as well as the lack of "an

4

acceptable level of fidelity or reliability." (Doc. 84-1 at 14-15, ¶¶ 30, 36.) He also criticizes WCMHS's and LCMHS's record-keeping, asserting log entries lack precision, there are inconsistencies in the manner of entering data in the logs, there is no evidence that John Doe is using his iPad, his communicative behavior is not monitored adequately, specific information targets are not clearly addressed, the data is not quantitatively summarized, there are inadequate incentives, and John Doe "appears to maintain a high degree of control over the environment." (Doc. 120-1 at 10, ¶ 28) (emphasis omitted). He opines that John Doe has unusual sleep patterns and inadequate hygiene habits that are being reinforced. He states he "could not find any systematically implemented system to quantitatively monitor John Doe's problem behavior." (Doc. 84-1 at 19, ¶ 52.)

Despite the alleged inadequacy of the documentation, Dr. Reichle believes he may nonetheless render opinions and opines as follows:

> Q. And what is your opinion regarding the quality of services in addressing the problem behaviors?

> A. I believe that Mr. Doe is at risk for continued problem behavior and potentially escalation of problem behavior, in part given the explanation that I've already provided but, also, when you implement a positive behavior support plan, it's important to have a variety of components, as I mentioned previously.

> I did not find those components in the plan that was designed for Mr. Doe, nor did I find, as was also the case with the Millmark [phonetic] report, I did not find evidence that they were being implemented with reliability or with fidelity. And that was as a result of what was reported in those daily logs.

> Q. And just to clarify one thing, when you say "problem behavior" can you define what you mean by that?

> A. Yeah, problem behavior would include things like aggression, property destruction, self-injury, a combination of those things. Basically there's quite a good list in the documents of problem behavior that creates dangers to [John] Doe or others.

> And then there's another list of behaviors that are present, potentially dangerous situations for [John] Doe or others. Those are all really good examples of what would constitute problem behaviors.

> Q. And you just testified that your opinion is that you have risk of

continued possible escalation, problem behaviors.

What's the harm to [John] Doe if these problem behaviors are not addressed?

A. Well, the harm to [John] Doe is he has instances of engaging in self-injury, so he could severely injure himself. He's caused concussions over the years in several staff members. He has aggressed against visitors, and fortunately I'm not aware of any concussion that have resulted from that.

He is in the community on a weekly basis, so if he gets in close proximity to individuals in the public, there's always a potential risk of dangerous behavior being emitted there.

He elopes, and it's mentioned throughout his history that he doesn't watch for oncoming traffic so that creates a potential danger to [John] Doe, definitely. So those are all in examples.

He has history -- a history of taking hot items off of a stove and throwing them at other people. That clearly presents a danger to others in the environment. So there are numerous examples that are in incident reports.

(Doc. 134 at 21-23.)

Dr. Reichle further opines that WCMHS and LCMHS have provided inadequate behavioral prompts to John Doe and that without proper management of John Doe's behavior, the potential for self-harm and violence towards others is significant. In particular, he criticizes the decision to allow John Doe to decide which activities he wants to engage in and claims that practice enables John Doe's aggressive behavior and non-compliance by reinforcing problem behavior. He notes that John Doe's behavioral issues started out as "fairly severe" and "it's really difficult to discern the degree to which his behavior is improving, not improving, getting worse."

He contends that if a "comprehensive behavioral support plan was put in place that included communicative options . . . [John Doe's] risk of institutionalization . . . would be significantly reduced." It would not be eliminated, however, because "it's the problem behavior that's the biggest offender to get them institutionalized." He concedes "it's harder to get institutionalized these days than it used to be." He further acknowledged that "[a]lmost anybody with the profile that [John] Doe has over the years has some level

of risk for institutionalization."

Between the court's hearing dates, Dr. Reichle provided an "Addendum Report," in which he opines that John Doe would benefit from "Applied behavior analysis (ABA)[,]" which he describes as follows:

> . . . ABA is the science of investigating procedures derived from the principles of behavior during their systematic application to improve socially significant behavior (Cooper Heron and Heward, 2007).

> . . . Some important features of ABA are that it a) Systematically describes and measures behavior, b) focuses on interventions that change socially significant behavior, c) has a strong experimental base of supporting evidence, d) requires objective and reliable data to make intervention decisions, e) addresses the importance of maintenance to guard against the resurgence of older less socially acceptable forms of behavior, f) promotes maintenance and generalization g) generates procedures [that] are highly individualized.

> . . . There are seven important steps to which most ABA programs adhere. These include a) identify the behaviors you want to change and the skills you want to establish, b) set goals and objectives that specify clear conditions that call for the behavior's emission, an objective and operationalized definition of the behavior that is the focus of the intervention and the consequences that will result from the emission of the behavior, c) design a measure(s) to monitor learner progress, d) evaluate the learner's existing skill set at the outset of intervention, e) develop and follow a treatment plan to teach the target behavior, f) regularly review progress and adjust the treatment plan in accordance with the data, and g) fade the prompts and supports that were needed to establish the behavior.

(Doc. 120-1 at 2.) He acknowledges that ABA was used previously with John Doe and it was pronounced a failure by John Doe's entire team.[2]

---

[2]

Q: . . . But you're aware that previously John Doe received services through SD [A]ssociates, correct?

A: Yes.

Q: And that was an ABA model, right?

A: It was claimed to be an ABA model, yes.

Q: It did not work, did it?

A: I don't know exactly what they were doing.

Defendants challenge Dr. Reichle's qualifications to opine regarding the standard of care in Vermont. They point out he is unfamiliar with Vermont's statutory framework, has no Vermont-based experience beyond a short stint after he graduated from college, and has only reviewed the records and the Sudol deposition in rendering his opinions which were formulated solely for the purposes of litigation.

Under Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

In determining the reliability of expert testimony, the court engages in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. Under *Daubert* and its progeny, relevant factors include the theory's testability, the extent to which it "has been subjected to peer review and publication[,]" the extent to which a technique is subject to "standards

---

Q: Okay. Right. But you know that whatever they were doing, the program did not have success, correct?

A: It was not a successful program. It was some time ago, and again, I don't know what they did.

Q: Okay. In fact, are you aware of the fact that it was viewed as a failure by – by all of the parties on [John] Doe's team?

A: Yes, I'm aware of that, but as I said before, I don't know exactly what they were doing.

(Unofficial Transcript of Sept. 29, 2023 hearing at 68-69.)

controlling the technique's operation," the "known or potential rate of error," and the "degree of acceptance" within the "relevant scientific community[.]" *Id.* at 593-94 (internal quotation marks omitted). "[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017) (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 644 (2018) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). The court has "broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142 (emphasis in original); *see also Restivo*, 846 F.3d at 575 (ruling "the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case") (internal quotation marks omitted). Plaintiffs, as the proponent of the expert witness testimony, must establish its admissibility. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016) ("The party offering the [expert] testimony has the burden of establishing its admissibility by a preponderance of the evidence.").

When determining whether an expert's testimony is admissible, the court must "make certain that an expert, whether basing [his or her] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos*, 303 F.3d at 265-66 (internal quotation marks omitted) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

In this case, it is unclear whether an expert in Dr. Reichle's field would render an opinion based on a paucity of information and without evaluating the individual, the staff who takes care of him, or his family members. On this basis alone, his opinion does not appear to reflect the degree of "intellectual rigor that characterizes" an expert in his field.

*See id.* at 266.

After an evaluation of John Doe, Dr. Reichle may be well qualified to create or assist in the creation of a behavioral and communication program for him. He is not qualified, however, to opine as to the applicable standard of care in Vermont or whether that standard has been breached. He did not consult applicable Vermont law before rendering his opinions, and he reviewed Vermont's statutory framework for the first time after the court's first day of hearings.

The fact that Dr. Reichle created his opinions solely for the purposes of litigation further undercuts their reliability. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (expressing a preference for opinions derived not solely for litigation purposes because "an expert [who] testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 430 ("Expert testimony developed solely for litigation can weigh against reliability."); *see also Grajeda v. Vail Resorts Inc.*, 2023 WL 4803755, at *13 (D. Vt. July 27, 2023) ("The fact that Dr. Scher's opinions were derived solely for purposes of litigation undercuts their reliability.").

To the extent Dr. Reichle opines that John Doe is at a risk for institutionalization, he does not adequately explain that risk or identify where and how John Doe would be institutionalized. Because he is unfamiliar with the applicable standard of care, Vermont's statutory framework, as well as the institutions to which John Doe could be committed without a mental disease or defect, his opinion appears to consist more of speculation than analysis. In any event, in John Doe's case, he concedes that the risk of institutionalization cannot be eliminated.

In summary, although Dr. Reichle is well qualified in his areas of expertise, he is not qualified to render an opinion that WCMHS's and LCMHS's services are inadequate under Vermont or federal law and create an increased risk that John Doe will be institutionalized. His opinions regarding the standard of care, a breach thereof, and the risk of institutionalization are therefore EXCLUDED under Fed. R. Evid. 702. He

remains qualified to opine regarding a communication and behavioral program that may benefit John Doe.

## II.     Findings of Fact.

The court makes the following factual findings by a preponderance of the evidence:

1. John Doe is an approximately thirty-five-year-old male under the guardianship of his mother, Linda Luxenberg, and sister, Kelcey Luxenberg, due to his diagnoses of ASD and Landau-Kleffner syndrome,[3] which substantially impair his sensory processing, verbal communication ability, and emotional and behavioral regulation to such an extent that he cannot function in the community without the assistance of staff and technological aids. He "has received disability services in Vermont for most of his life." (Doc. 159 at 6, ¶ 27.)

2. From approximately September 2009 until approximately December 2019, John Doe lived with his father, Roland Luxenberg, in Burlington and then in Monkton, Vermont. During this time, John Doe was supported by an array of services and service providers.[4]

3. In January of 2022, John Doe was evaluated by a psychiatrist who opined that "his behavior has posed a very serious safety risk to caregivers, though such behavior does not arise from a treatable major mental illness." (Ex. 11 at 47.) This

---

[3] Dr. Reichle describes Landau-Kleffner syndrome as a "rare language disorder" that:

> happens in typically developing children, usually between 3 and 8 years of age, and is characterized by the slow or sudden loss of the ability to use or understand spoken language. Language regression can be associated with social cognitive deficits and behavioral disorders, such as attention deficit, hyperactivity, impulsiveness, and the tendency to get distracted. Emotional lability, anxiety, and depression, sleep disorders, working memory impairment (but not long-term memory), and hypersensitive to sound may complete this clinical picture, which can sometimes be particularly complex.

(Doc. 84-1 at 8, ¶ 20.)

[4] John Doe was in a family managed-care plan for approximately six months, then was served by the Howard Center for approximately six months, then returned to family managed/primarily staffed by SD Associates for about four and a half years, before transitioning to a family-managed program for approximately five years. *See* Doc. 102-30 at 1-2, ¶ 4.

psychiatrist further opined that John Doe's "[t]hought processes [were] impossible to assess, though concrete by history. . . . Insight and judg[]ment [were] very impaired. Impulsivity is high." *Id.* at 49.

4. The medical records reveal that John Doe has made several trips to the emergency room where he has engaged in property destruction and assaultive behavior. Guardian Linda Luxenberg was concerned about his release from the emergency room because of a legitimate fear that he would elope as he has done in the past. The medical records further reveal that every referral has resulted in the receiving program backing out.

5. DAIL is a department within the Vermont Agency of Human Services (the "Vermont AHS") that, pursuant to Vermont's Developmental Disabilities Act (the "Act"), is required to plan, coordinate, administer, monitor, and evaluate services for those in Vermont with developmental disabilities. 18 V.S.A. § 8723.

6. DAIL provides funding to Designated Agencies and Specialized Services Agencies to provide direct care and support or contract with other providers or individuals to deliver support and services consistent with available funding, state and local System of Care Plans, and state and federal guidelines.

7. DAIL's rules and procedures require an ISA for John Doe setting forth the obligations of the Designated Agency in connection with his care. John Doe's ISA was agreed to by Plaintiffs who "signed off on it."

8. WCMHS is a non-profit organization in Vermont and has been the Designated Agency for John Doe until LCMHS took over his care. LCMHS has retained WCMHS staff.

9. John Doe currently lives in a single-family residence in Marshfield, Vermont. His home is equipped with technology which allows staff to monitor John Doe from a room that is inaccessible to him. There are also two staff members to assist and care for John Doe on a 24/7 basis. He has a number of communication devices, including an iPad, but he prefers to communicate verbally and by using a whiteboard. The staff has acquiesced in those preferences.

10. There is no credible evidence that Defendants have isolated John Doe.[5] To the contrary, John Doe engages in a number of activities in the community including swimming, hiking, visiting the library, going out for drives with his father, and grocery shopping. Plaintiffs propose no mechanism for ensuring he is less isolated while residing in Vermont. They provided no evidence that an alternative identified residence inside or outside Vermont is more suitable for him.

11. Roland Luxenberg asserts under oath that John Doe is well cared for in the Marshfield home, has developed positive relationships with the staff there, is "stable[,]" and he has "seen nothing that makes [him] concerned that John [Doe] is at risk of hospitalization or living in a residential/institutional setting." (Doc. 102-30 at 4, ¶¶ 14-15.)

12. The ISA that was in effect for John Doe from February 1, 2022 until January 30, 2023, stated that WCMHS would maintain oversight of the residence and support staff; monitor Medicaid services and help as needed; coordinate with a Registered Nurse regarding medication administration oversight; research and coordinate services of a clinical autism specialist and speech-language pathologist; coordinate a sensory evaluation; and coordinate additional services as needed. Not all of these services have been provided. According to the June 21, 2023 Sudol deposition, there are no consultants currently working with John Doe's team. On this point, she testified as follows:

> Q. So other than [WCMHS] and [Vermont Crisis Intervention Network], are there any other folks involved in [John] Doe's services?
>
> A. What do you mean?
>
> Q. Are there any current consultants working with the team?
>
> A. No.
>
> Q. Have there been any consultants working with the team since you've been involved?

---

[5] Roland Luxenberg states under oath: "John [Doe] is not isolated. To the degree one could describe his situation that way, any limits on his activities are reasonable." (Doc. 102-30 at 3, ¶ 10.)

A. So we're working on that. We had a consultation with the speech[-]language pathologist that worked with him formally, and we have reached out to other – another place called Aspire to help with clinical support. They were anxious to come to Vermont and help. They're out of Connecticut.

And I asked Linda [Luxenberg], or the guardian, to sign a release, and she was – wrote back to me saying that she checked them out and that they work with young adults and in school setting[s], but she was going to check with the director and get back to me, but I never heard back from her on that piece.

Q. Are there any autism specialists working with [John] Doe's team currently?

A. No.

Q. Is there any plan to obtain any autism specialists?

A. That was the plan. I was hoping that I could talk to the company in Connecticut, but Linda [Luxenberg] never signed the release, so.

Q. For Aspire?

A. Right.

Q. Is voc rehab working at all with [John] Doe?

A. No. I have an appointment set up with an employment specialist who we are at the point of debating whether we bring [John Doe] to her office. She – it's just the very beginning stages, but, yes, we are hoping to move in that direction.

. . .

A. . . . . I'd love to be able to hire this Aspire group that I inquired about and sent the information to Linda [Luxenberg], but she didn't want to sign a release. But they're chomping at the bit and ready and able to help us with all aspects of support.

I'm not really sure if that's the same thing as what you're talking about.

Q. What is it that Aspire is going to do?

A. They would bring a whole team. Head speech[-]language, autism specialist, helping with writing the behavior support plan, the communication plan, so I'm not really sure if that's the same thing as what you're talking about.

(Ex. 20 at 55-56, 178.)

14

13. Because neither Plaintiff testified, the court has no means of evaluating the truthfulness of Ms. Sudol's deposition testimony that Plaintiffs have not cooperated in the provision of services to John Doe.

14. Plaintiffs allege that WCMHS's failures to provide services pursuant to the ISA place John Doe at an increased risk of institutionalization. They contend WCMHS's failure to consult with an autism specialist, engage with a speech-language pathologist, conduct a sensory evaluation, or provide John Doe with a case manager, among other things, have placed him at risk for irreparable harm. Defendants counter that they have attempted to provide these services but Plaintiffs have not cooperated by signing releases.

15. Pastor Joshua Riggs visits John Doe sometimes alone and sometimes with his son. He contends that John Doe has always been very communicative with him about "the needs of his heart" but concedes John Doe's speech generally is monosyllabic. After John Doe assaulted both Pastor Riggs and his son by hitting them on the head, Pastor Riggs has visited John Doe less frequently. He has visited John Doe four times in the past year for approximately fifteen to forty-five minutes. He objects to being left alone with John Doe without staff present. He takes notes after his visits and sends them to Plaintiff Linda Luxenberg with whom he has a relationship based on performing work at her house and who has asked him to visit John Doe.

16. When Pastor Riggs visited the Marshfield home unannounced with two reporters from *Vermont Digger*, John Doe became agitated and the visit was terminated.

17. Plaintiffs have not identified a facility to which they seek John Doe's transfer. It is undisputed that LCMHS continues to provide services to John Doe, although the quality of those services is challenged.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

A party seeking a preliminary injunction must "generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary

relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *A.C.L.U. v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). Although in some cases a "sufficiently serious question[] going to the merits of [a] claim" may suffice, a plaintiff cannot rely on the more lenient "serious questions" standard where he seeks to "challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (internal quotation marks and citation omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations and internal quotation marks omitted).

As a threshold issue, the court considers whether the injunctive relief sought is mandatory or prohibitory and whether it would grant the moving party all of its requested relief. As the Second Circuit has explained:

> [W]e have required the movant to meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.
>
> . . .
>
> The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act. . . . [T]his distinction is important because we have held that a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief. The clear or substantial showing requirement—the variation in language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success.
>
> . . .

> A heightened standard has also been applied where an injunction—whether
> or not mandatory—will provide the movant with substantially all the relief
> that is sought. . . . If the use of a heightened standard is to be justified, the
> term "all the relief to which a plaintiff may be entitled" must be
> supplemented by a further requirement that the effect of the order, once
> complied with, cannot be undone. A heightened standard can thus be
> justified when the issuance of an injunction will render a trial on the merits
> largely or partly meaningless[.]

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-35 (2d Cir. 1995) (internal
quotation marks and citations omitted).

In this case, most of Plaintiffs' requested relief alters the status quo because they
seek John Doe's transition to a new facility, possibly out of the state, although that
facility has not yet been identified. They also seek an alteration in John Doe's services
and care through the hiring of Dr. Reichle. To the extent Plaintiffs argue the ISA is not
being followed, their request is prohibitory in nature. On balance, because the majority of
Plaintiffs' requested relief is mandatory in nature, a preliminary injunction requires a
heightened standard of proof because granting the relief will render a trial on the merits at
least partially meaningless.

## B. Whether Plaintiffs Have Established Irreparable Harm.

Irreparable harm is "the single most important prerequisite for the issuance of a
preliminary injunction[.]" *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42,
45 (2d Cir. 1983) (internal quotation marks omitted). Irreparable harm means "injury that
is neither remote nor speculative, but actual and imminent and that cannot be remedied
by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787
F.3d 638, 660 (2d Cir. 2015) (internal quotation marks omitted). There is also a "general
proposition that irreparable harm exists only where there is a threatened imminent loss
that will be very difficult to quantify at trial." *Tom Doherty Assocs., Inc.*, 60 F.3d at 38.

A "loss of medical care, in contravention of federal law, constitutes irreparable
injury." *Strouchler v. Shah*, 891 F. Supp. 2d 504, 522 (S.D.N.Y. 2012); *see also Whelan
v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979) (finding that "the threatened termination
of benefits such as medical coverage for workers and their families" during a strike

17

period "raised the spectre of irreparable injury"). Plaintiffs argue that John Doe presently lacks required services, supports, and programming and that WCMHS's and LCMHS's "acts and omissions to tracking, analyzing, and responding to [John] Doe's problem behaviors [are] inadequate, and likely causing him harm." (Doc. 84 at 4.) They also assert that staff has been ineffective in assisting and prompting John Doe in "hygiene activities" which has been harmful to his health. *Id.* at 4-5. Plaintiffs state that "[s]ince [W]CMHS took over as [John] Doe's Designated Agency in December 2022, staff have been harmed and [John] Doe has been harmed[,]" that he is "unable to fully communicate[,]" "has been, and continues to be, isolated[,]" and that he is currently at risk of institutionalization. *Id.* at 5.

Defendants contend that Plaintiffs have not established irreparable harm because John Doe is presently receiving services and benefits, he has not been institutionalized, and he receives adequate care to meet his needs, even if it is not the approach Plaintiffs advocate.

The court agrees that there is an unavoidable risk of harm to John Doe as well as others because of his disabilities. It also agrees that John Doe's ISA must be complied with. Because Plaintiffs did not testify, at this juncture, it is unrebutted that Plaintiffs have not cooperated in the provision of services to John Doe by signing releases. As a result, the court cannot find that Defendants are responsible for noncompliance with the ISA.

The court also cannot find that the risk of harm to John Doe would be eliminated or even reduced if the court ordered WCMHS to hire Dr. Reichle and create an ABA program, especially where that type of program has been tried in the past and failed.

Based on the record before the court, without evidence of John Doe's baseline and capacity for improvement, the court cannot find that John Doe's behavior and communication would improve if an ABA program or other services were provided. The court cannot, in turn, find that John Doe is at risk of irreparable harm. Instead, it appears that John Doe's case raises complex issues which will require the cooperation of all parties to address.

Because Plaintiffs have not established irreparable harm, on this basis, alone, their request for a preliminary injunction must be DENIED.

## C. Whether Plaintiffs Can Establish a Likelihood of Success on the Merits.

Plaintiffs assert that they are likely to succeed on the merits because: (a) John Doe is experiencing a substantial risk of institutionalization in violation of the Rehabilitation Act (the "RA"), the Americans with Disabilities Act (the "ADA"), and the Vermont Fair Housing and Public Accommodations Act; (b) Defendants have isolated John Doe from the community and thus have violated the ADA's integration mandate; and (c) John Doe is experiencing ongoing neglectful services and supports.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

"Because the standards imposed by Title II on public entities are generally equivalent to those of § 504," courts "treat claims under the two statutes identically in most cases." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). To state a prima facie claim under either provision, a plaintiff must establish "(1) that []he is a qualified individual with a disability; (2) that []he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to [his] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks and alterations omitted).

A plaintiff may base his discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation. *Davis*, 821 F.3d at 260. Plaintiffs do not clearly state claims based on any of these three theories. Instead, they appear to allege that Defendants have violated the standard of care. The ADA and the RA do not provide remedies for alleged treatment deficiencies. *See Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) ("At its core, the issue here is not whether [plaintiff] was denied medical services *because* she has a disability. Instead, her claim relates solely to whether she received adequate medical treatment in police custody *for* her disability, and such a claim is not cognizable under the ADA.") (emphasis in original); *Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir. 1998) (holding that where an individual challenges "the substance of the services provided" rather than "illegal discrimination[,]" there is no ADA violation).

There is no evidence that Defendants have discriminated against John Doe *because of his disability* or refused to provide a reasonable accommodation that has been requested.[6] The court thus finds Plaintiffs have failed to establish a likelihood of success on the merits under the ADA or the RA.

### D.    Whether John Doe is at Risk of Institutionalization.

"[A] plaintiff 'need not wait until the harm of institutionalization or segregation occurs or is imminent'" to bring a claim, but rather may identify a "'sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.'" *Davis*, 821 F.3d

---

[6] "[P]ublic entities must provide 'reasonable accommodations' to permit disabled individuals to have access to and take a meaningful part in public services and public accommodations." *Vincent v. Westchester Cnty.*, 2005 WL 8179311, at *5 (S.D.N.Y. Dec. 20, 2005). To determine whether a particular accommodation is reasonable, courts undergo a "fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995). A party seeking a reasonable accommodation has an obligation to identify and propose it. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) ("[The plaintiff] bore the initial burden of producing evidence that a reasonable accommodation was possible.").

at 262-63 (emphasis omitted) (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)). "[C]ourts of appeals applying the disability discrimination claim recognized in *Olmstead* have consistently held that the risk of institutionalization can support a valid claim under the integration mandate." *Id.* at 263 (collecting cases). Institutionalization is not a prerequisite to enforcement. *Id.* "[A] plaintiff may state a valid claim for disability discrimination by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons." *Id.*

Plaintiffs argue that John Doe is at substantial risk of institutionalization because: Defendants are failing to provide the programming, services, and supports that he needs; Defendants lack a methodology for understanding his behaviors; staff have not been appropriately trained to address and respond to his triggers; Defendants have failed to hire an autism consultant and speech-language pathologist; there is no programming provided to John Doe, rather, he is in charge of his own programming; John Doe is not improving his communication; his problem behaviors are not being addressed or understood; his health and hygiene are poor; and John Doe has, on numerous occasions, harmed himself and others.

The court agrees that John Doe currently lacks certain services that may reduce his risk of institutionalization. It cannot, however, find that Defendants have refused to provide those services. Instead, at this point, Plaintiffs have not rebutted evidence that they refuse to sign releases for such services.

The court also cannot find that John Doe's risk of institutionalization would be materially reduced if Dr. Reichle were retained to create an ABA program for him because an ABA program was used in the past and failed.

For the reasons stated above, Plaintiffs have failed to establish that Defendants' acts or omissions have increased the risk of institutionalization for John Doe.

### E.  Whether Defendants have Violated the Integration Mandate.

Plaintiffs assert that John Doe is isolated from the community in violation of the ADA's integration mandate because he lives in a rural home and depends on his staff to drive him places, spends most of his time at the Marshfield home, and has few outings.

They assert that due to the lack of programming, John Doe's behavioral issues and communication skills are not improving, which results in his spending less time in the community and engaging with others. They acknowledge that his behavior often renders community interactions dangerous for himself and others but blame Defendants for reinforcing that behavior.

In *Olmstead*, the Supreme Court held that "unjustified institutional isolation of persons with disabilities" is itself a prohibited "form of discrimination[.]" 527 U.S. at 600. The Court reached this conclusion even though the plaintiffs had not identified a "comparison class" of similarly situated, non-disabled individuals who were given preferential treatment. *See Admundson ex rel. Admundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (noting that "discrimination" as used in the ADA includes "undue institutionalization of disabled persons, no matter how anyone else is treated") (internal quotation marks omitted). *Olmstead* thus holds that persons with disabilities may not be unjustifiably isolated even if there is no similarly situated class as a comparison. *See Davis*, 821 F.3d at 262 (explaining that the "unjustified isolation" of "disabled individuals in institutionalized care facilities constitutes discrimination on the basis of disability under the ADA") (internal quotation marks omitted).

The integration mandate, promulgated by the Department of Justice (the "DOJ") pursuant to its enforcement powers under Title II of the ADA, provides that public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The mandate requires:

> a state to provide community-based treatment for disabled persons when (1) "the State's treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities."

*Davis*, 821 F.3d at 262 (quoting *Olmstead*, 527 U.S. at 607) (alteration in original). The "most integrated setting appropriate" is that which "enables individuals with disabilities

to interact with non-disabled persons to the fullest extent possible." *Olmstead*, 572 U.S. at 592 (internal quotation marks omitted).

In *H.A. by L.A. v. Hochul*, 2022 WL 357213, at *5 (W.D.N.Y. Feb. 7, 2022), residents living in their families' homes argued that they were unjustifiably isolated because their living situations "deprive[d] them of autonomy and independence and ma[d]e them dependent on the availability of their caregivers." *Id.* They further asserted "that they would be able to participate in more community outings and programs if they were no longer beholden to their caregivers' schedules" and they were presently deprived of choice in their daily activities in violation of the DOJ's integration mandate because of their dependence on their caregivers. *See id.* at *5-6 ("In the Department of Justice's view, integrated settings 'afford individuals choice in their daily life activities.'") (emphasis omitted). The court concluded that the residents in *H.A.* had plausibly alleged the state's failure to provide adequate community-based placements leaving them isolated in their homes and depriving them of independence and autonomy in violation of the integration mandate.[7]

In contrast, in the instant case, Plaintiffs allege John Doe has been given too much choice in his activities and communication style. They do not establish that John Doe lacks contact or interaction with the community, nor could they in light of the activities he engages in. They also do not identify a reasonable accommodation that would decrease his isolation. To the contrary, Linda Luxenberg has on at least one occasion opposed John Doe's release from a hospital based on a legitimate concern that he may elope.

---

[7] *See also Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1032-33 (D. Minn. 2016) (finding plaintiffs who resided with their parents adequately alleged they were suffering from unjustified isolation and segregation in violation of the integration mandate because their current living arrangements deprived them of independence and integration into the community on a social and cultural level); *E.B. ex rel. M.B. v. Cuomo*, 2020 WL 3893928, at *1 (W.D.N.Y. July 11, 2020) (recognizing a claim made by plaintiffs who were adults with developmental disabilities, qualified for services from a state agency, and were not capable of living in the community without assistance and support and who were presently living with family could bring an integration mandate claim because they were capable of living in the community with adequate supports).

Plaintiffs further cite no evidence that John Doe would benefit from a group home setting, nor have they identified any other setting where he would be less isolated. Plaintiffs have therefore failed to establish a likelihood of success in proving a violation of the integration mandate.

**F.      Whether Defendants have Provided Neglectful Services and Supports.**

Finally, Plaintiffs assert that Defendants WCMHS and LCMHS have or had a duty to provide John Doe with services that comport with the standard of care, while DAIL has a duty to plan, coordinate, administer, monitor, and evaluate the services WCMHS and LCMHS provide to John Doe. Plaintiffs state that all Defendants have failed to comport with the standard of care.

Because Plaintiffs have failed to proffer evidence of the standard of care, they cannot establish a likelihood of success on the merits in proving it has been breached. Although it is clear that John Doe's ISA has not been fully implemented, the court cannot find Defendants have caused that failure.

**G.      Whether the Balance of Hardships and the Public Interest Favor Injunctive Relief.**

The parties provide limited arguments with regard to the balance of hardships or the public interest. The court finds that this factor is in equipoise. John Doe's situation provides a complicated array of challenges which are not easily addressed. His guardians have legitimate concerns regarding his safety and well-being. Staffing deficiencies and behavioral management for an individual who is assaultive are likely to continue even if significant interventions take place.

Although Plaintiffs requested that John Doe be placed at Osprey Village, they appear to have withdrawn that request and have not cooperated with Osprey Village's request for information. A new facility for John Doe has not been identified.

## CONCLUSION

Because Plaintiffs do not satisfy the exacting standards for an "extraordinary remedy" of preliminary relief, *Nat. Res. Def. Council, Inc.*, 555 U.S. at 24, the court DENIES their second motion for a preliminary injunction. (Doc. 84.)[8]

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _2nd_ day of November, 2023.

Christina Reiss, District Judge
United States District Court

---

[8] Even if Plaintiffs could satisfy their burden of proof, many of Plaintiffs' requests for injunctive relief would impose standards that are too vague to be enforced. Under Federal Rule of Civil Procedure 65(d), every order granting an injunction must "state the reasons why it issued; [] state its terms specifically; and [] describe in reasonable detail . . . the act or acts restrained or required."