UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 JUL 18  PM 3: 30

CLERK
BY_____
DEPUTY CLERK

ROLAND LUXENBERG as successor      )
Guardian and father of JOHN DOE;   )
LINDA LUXENBERG, for herself,      )
                                   )
Plaintiffs,                        )
                                   )
v.                                 )      Case No. 2:22-cv-00188
                                   )
VERMONT DEPARTMENT OF              )
DISABILITIES, AGING AND            )
INDEPENDENT LIVING; MONICA         )
WHITE, in her official and individual )
capacities; JENNIFER GARABEDIAN,   )
in her official and individual capacities; )
WASHINGTON COUNTY MENTAL           )
HEALTH SERVICES INC.; MARY         )
MOULTON, in her official and individual )
capacities, and LAMOILLE COUNTY    )
MENTAL HEALTH SERVICES, INC.       )
                                   )
Defendants.                        )

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**
(Docs. 313, 316, 317, 318)

Plaintiffs Roland Luxenberg,[1] as successor guardian and father of John Doe, and

Linda Luxenberg ("Plaintiff Linda Luxenberg") (collectively "Plaintiffs") bring this

---

[1] On November 20, 2024, the Washington Unit of the Vermont Superior Court, Probate Division
(the "Probate Court") issued a decision removing Plaintiff Linda Luxenberg and Kelcey
Luxenberg as guardians and appointing Mr. Luxenberg as the sole successor guardian. *See* Doc.
301-8 at 2. Pursuant to the Probate Court's Order, the parties filed a consented-to motion for the
joinder and substitution of Mr. Luxenberg as successor guardian and plaintiff, (Doc. 327), which
the court granted in a January 28, 2025 Text Order. (Doc. 329.) On that date, Linda and Kelcey
Luxenberg were terminated from this lawsuit as guardians and next best friends of John Doe.
Plaintiff Linda Luxenberg remains a party in her individual capacity.

action against Defendants Vermont Department of Disabilities, Aging and Independent Living ("DAIL"); Monica White ("Commissioner White"), in her individual capacity and her official capacity as the Commissioner of DAIL; Jennifer Garabedian ("Director Garabedian"), in her individual capacity and her official capacity as the Director of DAIL's Developmental Disabilities Services Division (collectively, the "DAIL Defendants"); Washington County Mental Health Services Inc. ("WCMHS"); Mary Moulton, in her capacity as the Executive Director of WCMHS; and Lamoille County Mental Health Services, Inc. ("LCMHS") (collectively "Defendants"). Plaintiffs initially sought declaratory and injunctive relief arising out of Defendants' alleged termination of mental health services for John Doe without Plaintiffs' consent, failure to develop a transition plan of services for John Doe, and failure to provide funding for an appropriate placement for him.

Pending before the court is the motion for summary judgment filed by Defendants WCMHS, Ms. Moulton, and LCMHS on January 15, 2025, requesting the court grant judgment in their favor on each claim asserted against them. (Doc. 313.) Also pending before the court are the motions for summary judgment the DAIL Defendants filed on the same day requesting the same relief. (Docs. 316, 317, 318.) Mr. Luxenberg filed his response to Defendants' motions on February 18, 2025, stating he does not oppose summary judgment. (Docs. 336, 337.) Plaintiff Linda Luxenberg did not oppose Defendants' motions.

The Third Amended Complaint ("TAC") sets forth fourteen causes of action: a procedural due process claim under the Fourteenth Amendment of the United States Constitution and Article 4 of the Vermont Constitution (Count I); a Medicaid due process claim under 42 U.S.C. § 1396a(a)(3) (Count II); violations of the Rehabilitation Act (the "RA"), 29 U.S.C. §§ 701, 794(a), and 28 C.F.R. § 35.130(b)(7)(i) (Counts III, IV, V, VI, and VII); violations of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132 and 28 C.F.R. § 35.160(a)(1), (b)(1), (b)(2). (Counts VIII, IX, and X); a violation of the Vermont Fair Housing and Public Accommodations Act (the "VFHPA"), 9 V.S.A. § 4502 (Count XI); a negligence claim (Count XII); a retaliation claim in violation of 18

2

V.S.A. § 8728(b) (Count XIII); and a violation of John Doe's and Plaintiff Linda Luxenberg's right to free speech under the First Amendment to the United States Constitution (Count XIV). (Doc. 259.)

Mr. Luxenberg is represented by Eric G. Parker, Esq. Plaintiff Linda Luxenberg is self-represented. The DAIL Defendants are represented by Assistant Attorney General ("AAG") Edward M. Kenney. Defendants WCMHS, Ms. Moulton, and LCMHS are represented by Richard J. Windish, Esq., and Elizabeth A. Willhite, Esq.

## I.    The Undisputed Facts.

Because Plaintiffs do not oppose Defendants' motions for summary judgment and have not submitted a statement of disputed facts, Defendants' Statements of Undisputed Facts are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2).

John Doe, an adult male, has been diagnosed with Autism Spectrum Disorder and Landau-Kleffner syndrome. Mr. Luxenberg is John Doe's father, and Plaintiff Linda Luxenberg is his mother. DAIL "is a department within the Vermont Agency of Human Services." (Doc. 259 at 3, ¶ 10.) WCMHS is a non-profit in Vermont. "It is a 'Designated Agency' as part of Vermont's system of care providing services to people in Washington County with disabilities." *Id.* at ¶ 13. LCMHS is also a non-profit in Vermont that acts as a Designated Agency providing services in Lamoille County to persons with disabilities.

### A.    Upper Valley Services' Services to John Doe.

"On January 15, 2020, Plaintiff Linda Luxenberg became John Doe's sole guardian[,]" (Doc. 313-1 at 2, ¶ 3), and she decided to move John Doe to a home located at 365 Quarry Hill Road in Waitsfield, Vermont. After John Doe's move, non-party Upper Valley Services ("UVS") created and managed his Medicaid waiver program. The circumstances surrounding John Doe's move and UVS's provision of services were described by the Human Services Board ("HSB"):

> The [UVS] director and [Plaintiff Linda Luxenberg] worked very
> collegially to develop the program, which [the UVS director] described as a
> positive working relationship. They shared ideas and discussed who to
> hire, . . .

3

Before the anticipated implementation of the plan in 2020, [Plaintiff Linda Luxenberg] removed [John Doe] from his prior placement without the agreement or sanction of UVS and brought him to the residence in Waitsfield. The [UVS] director had not fully prepared the plan, hired staff, nor completed the written [] plan of services which was still under development. . . .

The collaborative and positive working relationship with [Plaintiff Linda Luxenberg] ceased at the time of implementation of the plan. The [UVS] director described a very different working relationship with [Plaintiff Linda Luxenberg] where he and the staff were not free to further develop the program because [Plaintiff Linda Luxenberg] was literally involved in every aspect of every decision and would summarily determine if their judgment was good or not good and acted more in a directive role as opposed to [a] cooperative role. P[laintiff Linda Luxenberg] would be cordial if staff were doing exactly what she wanted, but when there was a difference of opinion or staff were not doing something properly in her opinion, there was conflict.

It became clear to the [UVS] director and UVS staff within two to three days of their implementation of the plan that the program was not going to work. P[laintiff Linda Luxenberg] would not allow UVS staff to administer medication which had been prescribed to [John Doe] to assist in regulating his behavior. Within the first week, [Plaintiff Linda Luxenberg] would not allow UVS to continue the services of their psychiatrist and would not allow their psychiatrist to reorder [John Doe's] medications.

P[laintiff Linda Luxenberg] also refused to allow UVS staff to use any form of physical intervention or physical restraint with [John Doe].

(Doc. 316-19, at 5-6, ¶¶ 7, 8, 10-12.)

On April 24, 2020, UVS notified Plaintiff Linda Luxenberg and DAIL via letter that its was terminating John Doe's services. Thereafter, DAIL and UVS collaborated with WCMHS to transition John Doe's services to WCMHS.

On May 18, 2020, while still receiving services from UVS, John Doe was transferred via ambulance to the Mary Hitchcock Memorial Hospital ("DHMC") emergency department ("ED"), where he remained until August 13, 2020.

At the time of admission in mid-May, John Doe was engaging in multiple self-injurious behaviors including head banging, pinching, scratching[,] and biting himself. [ED staff] saw an improvement in the self-injury during the first part of his stay, a resumption of self-injury at the end of June/early July[,] and again an improvement the past few weeks. Additionally, John

4

Doe had been repeatedly assaultive towards ED staff members, often in the
context of being prevented from leaving the [ED]. At the end of May/early
June this was thought to be related to his mother's visits and [ED staff]
asked her to stop her visits.[2] [ED staff] saw improvement initially, but again
resumption of agitation a few weeks later . . . His mother was asked to
return to visit him, which she declined on [June 25] and on two other
occasions . . . . He can be quite friendly and engaged with staff, and clearly
has enjoyed visits from WC[MH]S[] staff more recently.

(Doc. 313-1 at 3, ¶ 8) (brackets omitted). Due to conflict with the DHMC ED team,

Plaintiff Linda Luxenberg arranged for all communications to go through her attorney,

who did not have the authority to make any medical decisions for John Doe.

**B.    WCMHS's Services to John Doe.**

WCMHS accepted UVS's transfer request for John Doe's services in June 2020,

while he was still at DHMC's ED. "WCMHS met daily with DH[MC] to discuss John

Doe's status and reviewed documentation from UVS to gain knowledge on [him]." *Id.* at

3-4, ¶ 9. WCMHS employees Kathleen Jennings and Annabelle Trayah first met John

Doe at DHMC in July 2020, "in a locked room when he was physically restrained." *Id.* at

4, ¶ 10.

In July 2020, DHMC admitted John Doe to the ED "due to . . . : out-of-control

behaviors[,] running away from home, smashing windows, and climbing up on the

roof[,]" *id.* at ¶ 11 (internal quotation[] marks omitted), as well as self-injurious behaviors

including "banging his head, pinching, scratching, and biting himself." *Id.* During his

time at the ED, John Doe assaulted sixteen ED staff members. As a result, he was

physically restrained multiple times in a day. While John Doe was at DHMC, Plaintiff

Linda Luxenberg "frequently change[d] her mind about what treatment plan should be

pursued . . . and [wa]s inaccurate in conveying information between various parties about

John Doe's care and disposition." (Doc. 313-1 at 4-5, at ¶ 12) (brackets omitted).

---

[2] For example, hospital records document "[Plaintiff] Linda Luxenberg's repeated use of []
known trigger words[.]" (Doc. 316-1 at 13, ¶ 22.) She also "frequently provide[d] information to
the hospital team that was inaccurate[,]" *id.* at ¶ 23, specifically regarding John Doe's discharge
plans and options.

On July 6, 2020, DHMC filed a motion to terminate or modify adult guardianship with the Vermont Superior Court, Probate Division, Washington Unit (the "Probate Court"). The motion stated that Plaintiff Linda Luxenberg, who had previously represented she intended to move John Doe to South Carolina, now intended to move him into her home in Stowe, Vermont. It also stated that John Doe previously stayed at that home with Plaintiff Linda Luxenberg for two nights and she "failed to administer any of his medications." (Doc. 316-1 at 15, ¶ 27b.)

Commissioner White testified that the motion to terminate or modify the guardianship was filed because "[Plaintiff] Linda [Luxenberg] had consistently sabotaged [John Doe's] care plans and demonstrated hostility towards service providers with a history of detrimental conduct that really has hampered [John Doe's] care." *Id.* at ¶ 28.

The Probate Court granted DHMC's motion on August 3, 2020, ruling in relevant part:

> To continue to keep John Doe in an environment where restraint becomes the norm when there are less restrictive environments available is outside the bounds of the policies of [14 V.S.A.] § 3060[].
>
> What the court finds unreasonable about [Plaintiff Linda Luxenberg's] adamant position is that there is no time-frame for an end to his exposure to all the ED trauma. The evidence is conflicting at best and unconvincing at worst as to the status of any application to [a facility in Maryland] or, especially, if accepted[,] when he could leave the ED if the court permits him to remain there.
>
> The court finds that the unreasonableness of not attempting the [Vermont Crisis Intervention Network] [("]VCIN["]) crisis bed under the circumstances constitutes a change in the capacity or suitability of [Plaintiff Linda Luxenberg].
>
> It is not responsible to refuse to have [John Doe] discharged from the ED at DHMC when the Director of Psychiatry at DHMC, the nurse manager of the ED at DHMC, the Development Director at WCMHS[,] and John Doe's father have opined that John Doe's continued residency at the DHMC ED is an inappropriate placement for John Doe.

(Doc. 313-1 at 5, ¶ 13) (brackets and internal citations omitted). Based on these findings, the Probate Court appointed the Office of Public Guardian ("OPG") as John Doe's guardian.[3]

The DAIL Commissioner held a hearing on Friday October 16, 2020, "regarding Adult Protective Services'('APS') recommendation that [Plaintiff Linda Luxenberg] be substantiated for neglect of [John Doe]" while acting as John Doe's legal guardian. DAIL determined that "[t]he APS Report outline[d] sufficient information that would lead a reasonable person to believe that [Plaintiff Linda Luxenberg] intentionally or recklessly failed or omitted to provide care or arrange for goods and services necessary to maintain the health and safety of [John Doe], a vulnerable adult." (Doc. 316-18 at 1, 5.) Plaintiff Linda Luxenberg appealed DAIL's substantiation, and her appeal was denied.

After assuming the role of John Doe's service provider, WCMHS found and purchased a home for him which was modified and staffed for his safety. WCMHS also reviewed John Doe's records to familiarize itself with his needs. In accordance with Plaintiff Linda Luxenberg's request, it set up biweekly "Friends of Doe" meetings. "Even though Plaintiff Linda Luxenberg was no longer John Doe's guardian," she was invited to participate in these and other meetings "related to John Doe's program and services." (Doc. 313-1 at 6, ¶ 16) (internal quotation marks omitted).

As John Doe's new service provider, WCMHS created a Needs Assessment and Comprehensive Behavior Support Plan ("BSP") for him. It also finalized his Individual Support Assessment ("ISA"), a document updated annually or more frequently if needed. "The ISA included the waiver services allocated to John Doe, which were 18.8 Hours/Week of service planning and coordination[,] community supports[,] supportive services, clinical interventions, supervised living, transportation, and administration costs." *Id.* at ¶ 18 (citation omitted).

John Doe's WCMHS team included Ms. Jennings, his Program Coordinator from June 2020 to November 2022; Ms. Trayah, his Case Manager whose only assigned client

---

[3] Within OPG, Maryann Willson served as John Doe's guardian.

was John Doe; and Anne Hood, who served as a behavioral consultant.[4] WCMHS also assigned John Doe a registered nurse, a psychiatrist, WCMHS support staff, and VCIN staff, as well as contracted outside professionals.

WCMHS made several attempts to obtain speech language pathology services for John Doe. It first communicated with Ashley Couture, a speech language pathologist ("SLP"). Although Ms. Couture was unable to provide John Doe services, she recommended another SLP, Emily Mortner. On February 5, 2021, Ms. Willson informed WCMHS that she had scheduled a home visit for Ms. Mortner with John Doe on March 16, 2021. Ms. Mortner was unable to attend the visit and she thereafter declined further attempts to schedule one. WCMHS then reached out to another SLP, Julie Taylor, who declined to work with John Doe. As WCMHS continued to search for an SLP, John Doe was provided with white boards and social scripting to support his communication needs.

While WCMHS was John Doe's service provider, Plaintiff Linda Luxenberg appealed the Probate Court's decision removing her as guardian. On May 21, 2021, the appeal was resolved by a stipulated agreement. As a result, "OPG was removed as John Doe's guardian and replaced by . . . Kelcey Luxenberg[,] John Doe's sister in the Netherlands[,] and Kimberly Kindig[,] John Doe's aunt in Florida[]." *Id.* at 7-8, ¶ 24.

Pursuant to the parties' stipulation, "Kate Panaccione, Ph.D. of Square Peg Consulting would serve as a consultant to John Doe's treatment team to facilitate communication between members of the team and provide recommendations for treatment in her area of expertise in autism and behavioral analysis." *Id.* at 8, ¶ 24. Dr. Panaccione began rendering services for John Doe on April 27, 2021, which included "participating in meetings; [] supporting WCMHS to lead clinical team meetings; [] coordinating information sharing between WCMHS, treatment team, and family; [] train[ing the] team; and [] updat[ing] the BSP." *Id.* at 8, ¶ 25.

---

[4] Ms. Hood joined John Doe's WCMHS team on December 1, 2020. At a later, unspecified date, Sherri Rosenberg joined the team "to create an [applied behavior analysis] program, as requested by the family." (Doc. 313-1 at 10, ¶ 33.) She was dismissed by John Doe's guardians before she could render her recommendations.

On May 12, 2021, "[Dr.] Panaccione made a report of abuse/neglect based on her perceived immediate safety concerns for John Doe and his caregivers[.]" *Id.* at ¶ 26. Three days later, on May 15, she followed up on her report and called the Vermont State Police ("VSP"). She spoke with VSP Trooper Jon Prack and requested that John Doe be transported immediately to the DHMC ED "to ensure his safety as well as . . . WCMHS's staff's safety until a more appropriate placement could be located." (Doc. 313-1 at ¶ 27.) VSP, deferring to DAIL, denied this request. At the time of her original report and her follow-up, Dr. Panaccione had not yet met John Doe or visited his Marshfield home.

On May 28, 2021, Ms. Hood terminated her contract to provide behavioral services to John Doe. In her email to WCMHS, she stated:

> I am particularly uncomfortable being in a position of communication liaison between the agency and the [co-]guardians at this time while legal threats are directed at me. I am being put in a very difficult position and am getting multiple emails from [Dr. Panaccione], [Ms. Kindig], and now [Plaintiff] Linda [Luxenberg] insisting that if I am speaking in any way to specific members of the WCMHS team then I am in violation of certain laws and regulations putting my career, reputation[,] and upcoming license in jeopardy.

*Id.* at 9, ¶ 29 (citation omitted).

Four days later, on June 1, 2021, Dr. Panaccione emailed WCMHS and DAIL the following:

> Wow. All I can say is the level of arrogance, ignorance, and criminal behavior continues to astound me. . . . If [Ms.] Hood and Julie Martin participate in the illegal[ly] scheduled meeting[,] they are behaving in a criminal way. For [Ms. Hood] that means she could lose her license to practice. . . [.] I don't know how you sleep at night. Have you no moral compass?

*Id.* at ¶ 31 (alteration in original) (citation omitted). On June 3, 2021, Dr. Panaccione emailed WCMHS, Kelcey Luxenberg, Ms. Kindig, and Plaintiff Linda Luxenberg. The subject line read "DO NOT TAKE [JOHN DOE] TO PARK TO SEE HIS FATHER!!!!" *Id.* at 9-10, ¶ 32. In the body of the email, she explained that "[i]t [wa]s unsafe to transport [John Doe] to a setting other than the familiarity of his home to visit his father

who he hasn't seen [in] a very long time (unless I wasn't consulted, and he has already met him)." *Id.* at 10, ¶ 32.

On December 28, 2021, Plaintiff Linda Luxenberg sent an email to Kelcey Luxenberg and Ms. Kindig directing them to discontinue paliperidone and stating "that a new doctor[] . . . agree[d] with th[at] decision." (Doc. 313-1 at 10, ¶ 37) (citation and internal quotation marks omitted). Upon receiving this email, Ms. Kindig forwarded it to WCMHS and directed them to discontinue the medication. WCMHS psychiatrist, Robert Duncan, M.D., responded as follows to Ms. Kindig's request:

> Against my medical advice, per your request, I have ordered that the paliperidone be stopped. It continues to be my advice that the dose be increased to at least 3 mg, if not 4.5 mg/day, due to the association of a higher dose of paliperidone with improved (reduced) aggression, self-care and hygiene, sleep improvement, as well as importantly to be able to engage with others and the broader community.

*Id.* at 11, ¶ 38.

Six days after WCMHS staff discontinued paliperidone, Dr. Duncan emailed Kelcey Luxenberg and Ms. Kindig to notify them that John Doe was "chasing staff out of his living area, including assaulting them[.]" *Id.* at ¶ 39 (internal quotation marks omitted). He explained he "[could ]not help but connect the stopping of his paliperidone with the increase in aggression and decrease in self-care (bathing, biting himself, venturing outside in the winter)." *Id.* (internal quotation marks omitted). He urged Kelcey Luxenberg and Ms. Kindig to allow WCMHS to administer paliperidone.

Ms. Kindig replied: "I am in agreement to give him paliperidone." *Id.* at 11, ¶ 40 (internal quotation marks omitted). Kelcey Luxenberg did not consent, and responded: "[I]t appears that the situation is beyond the point of paliperidone/medication. What are our other options? Get him to a hospital?" *Id.* at ¶ 41 (internal quotation marks omitted).

On January 15, 2022, John Doe was taken to the ED at the Central Vermont Medical Center ("CVMC") after he assaulted multiple on-site staff members, one of whom was injured as a result. Two days after this incident, WCMHS indicated to Ms. Kindig that, to transfer John Doe back to his home, it would require two staff members

trained to physically intervene if needed. It would also require John Doe to take the medications prescribed by Dr. Duncan and the CVMC psychiatric team. Ms. Kindig agreed, but Kelcey Luxenberg initially refused to grant her approval. Thereafter, Kelcey Luxenberg agreed and John Doe was transferred back to Marshfield on January 25, 2022.

WCMHS secured an SLP, Danielle Kent, on February 9, 2022. She contracted "to provide [speech and language therapy] services at least [three times a] month between March and June 2022." (Doc. 313-1 at 13, ¶ 47.) As part of her work, she wrote two consultation reports dated March 10, 2022, and April 14, 2022. In her first report, she recommended that John Doe have "access to robust [augmentative and alternative communication ('AAC')] for autonomous communication capacities." *Id.* at ¶ 51. WCMHS did not perform an AAC evaluation, however, because Kelcey Luxenberg instead directed John Doe's team to purchase an iPad in preparation for his anticipated imminent move to South Carolina.

Ms. Kent provided the following suggestions, which WCMHS adopted, regarding John Doe's Communication Plan:

> John Doe has obtained an iPad with a prescribed support system through an assistive chat app. [Ms. Kent] continues to work with John Doe and the team to implement the chat app. John Doe is still in the beginning stages of this support and is not yet initiating or engaging in use of the app, but is receptive to staff modeling to familiarize himself with [the] app.

*Id.* at ¶ 50 (brackets omitted).

### C.    Transition of Services from WCMHS to LCMHS.

On May 28, 2021, Plaintiff Linda Luxenberg filed a motion with the Probate Court requesting that she be added as a third guardian for John Doe. The Probate Court held a hearing on Plaintiff Linda Luxenberg's motion on November 2, 2021, during which she "represented that John Doe's out-of-state placement to Osprey Village was moving forward and admission would be likely as soon as John Doe's medications were titrated."[5] *Id.* at 10, ¶ 36.

---

[5] The Probate Court denied Plaintiff Linda Luxenberg's motion on June 6, 2022, finding:

In November 2021, John Doe's co-guardians requested a transfer of services from WCMHS to LCMHS. Three months later, on February 4, 2022, Commissioner White contacted the CEO of the Osprey Village in South Carolina, Julie Kuhns, to inquire whether John Doe had been accepted for admission there. Ms. Kuhns responded that she had "informed the family that the only service[] Osprey Village could provide [was] financial management." *Id.* at 14, ¶ 54. Thereafter, Keith Grier suggested to Kelcey Luxenberg, John Doe's sole guardian at the time, that she invite Ms. Kuhns to the next team meeting.

In a March 8, 2022 email titled "Hatred driven Ambient Abuse inflicting Harm to Family in Protection of Severely Disabled Vulnerable Adult in Vermont[,]" Plaintiff Linda Luxenberg stated: "I am in South Carolina, with my mom, preparing for John Doe to transition to Medical care at [the Medical University of South Carolina's] Institute of Psychiatry. WCMHS and DAIL have no options and have provided zero support to this transition." *Id.* at ¶ 56 (internal quotation marks omitted). Plaintiff Linda Luxenberg and WCMHS, however, discussed this transition during the June 1, 2022 planning meeting. The group determined John Doe would live in Stowe, at Plaintiff Linda Luxenberg's

---

[T]hat [Plaintiff] Linda[] [Luxenberg's] inability to effectively deal with [John Doe's] care providers has not been limited to WCMHS. She was hypercritical of the home-based care provided by [John Doe's] father. She has been disruptive and undermining of the care provided by WCMHS. Because she has been so difficult with WCMHS in refusing to accept their model of care and so disparaging of its staff and programs, the [c]ourt does not see how [Plaintiff] Linda [Luxenberg] can be an effective guardian of the rights and responsibilities afforded to [John Doe] under Vermont law.

[] In addition, [Plaintiff] Linda [Luxenberg's] plan for [John Doe's] immediate move to South Carolina without funding in place or a confirmed plan for services is not in [John Doe's] best interest. The combination of [Plaintiff] Linda[] [Luxenberg's] inability to effectively deal with [John Doe's] care providers and the lack of confirmed transition planning and funding outweigh the favorable factors set forth above. In weighing the evidence against the factors of [14 V.S.A.] §3072(b) by the preponderance of the evidence standard, the [c]ourt is unable to find that [Plaintiff] Linda [Luxenberg] should be appointed [John Doe's] co-guardian.

(Doc. 316-1 at 7-8, ¶ 11.)

home, and that such a transition would require LCMHS's cooperation. During the meeting the parties also discussed John Doe's recent outings, which included a visit from Mr. Luxenberg at Marshfield, walks outside, swimming at a local pool, a visit from his sister Andrea, and a "plan to see 'Big Trucks.'" (Doc. 313-1 at 15, ¶ 57) (citation omitted).

During a September 21, 2022 planning meeting, which Plaintiff Linda Luxenberg and Kelcey Luxenberg attended with their attorney, Zachary Hozid, Esq., the parties "discussed [the] possible early stage of transition out of Marshfield to Stowe[.]" *Id.* at 16, ¶ 64 (brackets omitted). Attorney Hozid was tasked with ensuring DAIL and LCMHS were present at the next meeting.

On October 4, 2022, WCMHS gave John Doe's co-guardians, Plaintiff Linda Luxenberg and Kelcey Luxenberg, formal notice of termination of services for John Doe, and they met with Plaintiff Linda Luxenberg, Kelcey Luxenberg, and Attorney Hozid the next day to discuss the transition of services to LCMHS. At the meeting, Attorney Hozid stated: "The guardians are well-positioned and eager to move John Doe to the Stowe community. Housing options exist; it's a matter of determining the best housing situation for John Doe and transfer his current budget to LCMH[S] to ensure continuity of [developmental s]upports." *Id.* at 16-17, ¶ 66 (internal quotation marks and brackets omitted). Neither Commissioner White nor Director Garabedian were involved in WCMHS's decision to transfer John Doe's services to LCMHS.

Plaintiff Linda Luxenberg and Kelcey Luxenberg appealed WCMHS's termination notice on October 7, 2022. The HSB scheduled a hearing on the appeal for November 4, 2022. The hearing was canceled by John Doe's co-guardians on October 27, 2022, after the parties reached an agreement.

### D. A Change in John Doe's Guardianship.

After informing Plaintiff Linda Luxenberg on January 16, 2022 that she wished to end her role as John Doe's guardian, on January 19, 2022, Ms. Kindig filed a motion to terminate her role as guardian with the Probate Court. Therein, she stated her reason for doing so was "due to conflict between [her]self, Kelcey Luxenberg (co-guardian), and

[Plaintiff] Linda Luxenberg ([John] Doe's mother)." *Id.* at 12, ¶ 45 (internal quotation marks omitted).

On August 2, 2022, the Probate Court reappointed Plaintiff Linda Luxenberg as co-guardian along with Kelcey Luxenberg. During the July 29, 2022 hearing on Plaintiff Linda Luxenberg's motion, Ms. Kuhns testified that "Osprey Village has two threshold requirements to provide case management services, and one of these [wa]s that the disabled individual[']s[] guardian . . . be a resident of South Carolina[,]" *id.* at 15, ¶ 60, and Plaintiff Linda Luxenberg asserted that "she had purchased a home in Osprey Village."[6] *Id.* at ¶ 61 (internal quotation marks omitted).

The Probate Court found that:

> Because both DAIL and WCMHS represented that they have no objection to John Doe moving South Carolina, the [c]ourt is willing to appoint [Plaintiff] Linda [Luxenberg] as co-guardian of John Doe if [Plaintiff] Linda [Luxenberg] presents to the [c]ourt properly authenticated documentary evidence or a sworn statement from an executive of a federal or state governmental agency or an executive of an organization or agency service provider that John Doe would be ineligible to move to South Carolina and obtain developmental disability services and funding unless [Plaintiff] Linda [Luxenberg] is named as John Doe's co-guardian.

(Doc. 313-1 at 15, ¶ 59) (brackets omitted). At the time of the hearing, Plaintiff Linda Luxenberg was in the process of selling her Osprey Village home, which she sold twenty days after the Probate Court reappointed her as John Doe's guardian.

After the Probate Court issued its Order, Commissioner White and WCMHS filed a joint renewed motion for an immediate interim Order modifying John Doe's guardianship. Therein, the parties asserted that "[Plaintiff] Linda Luxenberg . . . continued to force [John] Doe to be transported to hospital [EDs]," even though "[s]uch hospital visits dysregulate [John Doe] and leave him, his care providers[,] and hospital

---

[6] As part of its June 6, 2022 Order, the Probate Court noted that it would reconsider appointing Plaintiff Linda Luxenberg as co-guardian if she provided evidence that John Doe's move to South Carolina was imminent and that circumstances had changed such that there was "sustained participation, cooperation, and a general level of harmony free from unreasonable discord with a designated agency providing agency-based care or assisting with family service care to [John Doe]." *Id.* 316-1 at 8, ¶ 12.

staff at risk." (Doc. 316-1 at 16, ¶ 29a) (citation omitted). They also stated that Plaintiff Linda Luxenberg's conduct "compelled [John] Doe's primary care provider [('PCP')] . . . to formally terminate the doctor/patient relationship with [John] Doe," *id.* at ¶ 29b, and that John Doe's co-guardians twice refused WCMHS's suggestions for alternate PCPs.[7]

### E.     LCMHS's Services to John Doe.

LCMHS began processing John Doe's admission paperwork, and on November 9, 2022, it emailed Plaintiff Linda Luxenberg and Kelcey Luxenberg requesting information and signed consents to treatment. On January 17, 2023, LCMHS Executive Director Michael Hartman sent an email to Attorney Hozid, stating:

> The amount of email, the meetings, and the number of persons involved is staggering and needs better management, which I think we have all agreed could be changed. The distraction of constant emails, while we are involved in the higher level needs of [the individualized support agreement], releases, medical care, and other direct service factors is not helpful to the consumer[.]

(Doc. 313-1 at 17, ¶ 69) (citation omitted).

On March 31, 2023, LCMHS requested Plaintiff Linda Luxenberg sign a release allowing Aspire Living and Learning ("Aspire") to review John Doe's medical and program records. Plaintiff Linda Luxenberg did not sign the release because Elizabeth Sellinger, an Aspire employee, was in charge of overseeing schools specifically for children and John Doe was an adult. Plaintiff Linda Luxenberg eventually signed a conditional release on August 4, 2023, allowing LCMHS to share limited information and details as requested with Aspire.

Six months later, on February 9, 2024, LCMHS received an email from Ms. Sellinger wherein she explained:

> [Plaintiff Linda] Luxenberg contacted me via email yesterday, asking if Aspire is providing services to adults in Vermont. . . . Yesterday afternoon, [Plaintiff Linda] Luxenberg contacted Lisa Mierek (Senior Director of Adult Services – Connecticut) via phone. During this call, [Plaintiff Linda]

---

[7] The Probate Court "ordered that [Commissioner White's] and WCMHS's joint motion to remove [Plaintiff] Linda [Luxenberg] and [Kelcey] Luxenberg be stayed 'pending the outcome in the federal court litigation.'" (Doc. 316-1 at 18, ¶ 31.)

> Luxenberg explained her understanding from [the LCMHS] team is that
> Aspire would be coming in and providing direct staff support and clinical
> oversight to [John Doe's] case. . . . Unfortunately, it seems [Plaintiff Linda]
> Luxenberg may not wish to provide consent for additional consultation
> beyond what we have completed to date.

*Id.* at 18, ¶ 72 (seventh alteration in original) (internal quotation marks omitted).

Plaintiff Linda Luxenberg then sent an email to LCMHS stating that Ms. Sellinger

"informed [her that] she had not received sufficient documentation to conduct an

assessment . . . no services, staffing[,] or training and oversight w[ere] a possibility for

[John Doe] in the Marshfield, Vermont site by Aspire." *Id.* at ¶ 73 (internal quotation

marks omitted). Ms. Sellinger responded to Plaintiff Linda Luxenberg's email as follows:

> I informed [Plaintiff Linda] Luxenberg that [Aspire] received records
> consistent with permission granted in the [release of information
> ("ROI")]. . . . [] It was my perception[] that [Plaintiff Linda] Luxenberg
> was not interested in further consultation from Aspire, as evidenced by the
> statements such as, ["]you don't want to get involved in this.["]

*Id.* at 18-19, ¶ 74.

On June 21, 2024, Plaintiff Linda Luxenberg sent an email to "at least 15 state and

federal officials (including Congresswoman Bal[i]nt)[,]" (Doc. 316-1 at 21, ¶ 40), where

she stated in relevant part:

> Now that Vermont is the laughing stock of the NewsNation and beyond, it
> is time to end the charade which has occurred regarding my role protecting
> my [s]on from the Systemic Failures which have literally nearly killed him.
> Should you need to understand the depth of the wrongful acts inflicted on
> my [s]on, please contact me for concrete horrifying details difficult to
> fathom knowing the reality. The videos I can reference are far more
> alarming than were displayed last night on NewsNation and in VTDigger.
>
>                                 * * *
>
> My contact with Geraldo [Rivera] and [Chris] Cuomo of NewsNation has
> me next on deck should this game continue which is putting my [s]on at
> risk in Vermont, a state which has been incapable of serving my [s]on's
> level of neurological complexity other than isolating him into remote
> settings in trailers, far from society.
>
>                                 * * *

> Currently I have, in my role of advocacy, connected with Medical and
> Dental professionals concerned with my [s]on's risk due to mistreatment.
>
> &ast; &ast; &ast;
>
> My voice is strong, healthy[,] and will not be stifled through deceitful
> actions.
>
> &ast; &ast; &ast;
>
> Statements have my concern that tactics are far from knowledge based, but
> with irresponsible actions putting in question the character of the decision
> makers privy to my [s]on's life circumstances (due to my Ardent
> Advocacy[])[.]

(Doc. 316-27 at 1, 2, 4, 5.)

Five days later, Plaintiff Linda Luxenberg contacted DAIL Commissioner Jill
Bowen via email and in relevant part stated: "Most of my victories have been
accomplished Pro Se, where I stand proudly today exercising my right to the [F]irst
[A]mendment valuing Free Speech." (Doc. 316-29 at 1.) On July 5, 2024, Plaintiff Linda
Luxenberg sent an email titled "Vulnerable Adult Vs. Designated Agency in Protection"
to multiple recipients wherein she stated "medical urgency due to Blatant
Mistreatment/Unhealthy Conditions at Marshfield Confirmed at [the University of
Vermont Medical Center ('UVMMC')] [July ]3[.]" (Doc. 313-1 at 19, ¶ 75) (brackets
omitted).

In the summer of 2024, while under the care of LCMHS, John Doe underwent
various medical procedures. In May 2024, LCMHS sent an email to Plaintiff Linda
Luxenberg and Kelcey Luxenberg informing them LCMHS could not "communicate with
UVMMC about [John Doe's] urology appointment, nor provide the information
requested, unless one of [them] complete[d] and sign[ed] the ROI that authorizes these
communications." (Doc. 313-1 at 19, ¶ 77.) LCMHS followed up on June 11, 2024, via a
letter in which it explained it could not serve John Doe's health and safety needs as a
result of the co-guardians' failure to sign ROIs, annual paperwork, and the Residency
Agreement.

On July 23, 2024, LCMHS staff received a progress note from UVMMC urologist,
Mohammad Mohaghegh, M.D., indicating John Doe had been seen "for evaluation of

microscopic hematuria[.]" (Doc. 316-1 at 19, ¶ 34) (internal quotation marks omitted).
The note also stated:

> Mom is quite concerned about [John Doe's] current living arrangement.
> She discussed with me if he would be able to get other services consulted
> when he is down for his cystoscopy and perhaps keep him at the UVMMC
> while [she] and the rest of her family finds alternative living arrangements
> for him.

(Doc. 313-1 at 20, ¶ 79) (brackets omitted). On July 25, 2024, LCMHS was unable to
review the totality of John Doe's recent medical records because Plaintiff Linda
Luxenberg revoked the ROI.

On August 14, 2024, Plaintiff Linda Luxenberg sent an email to AAG Kenney
which stated in relevant part:

> Backtracking again, Ted. I'll let CNN investigate. The truth will be
> enlightening.
>
>                    * * *
>
> The antics are very obvious and quite frankly difficult to fathom when a
> human being suffering is at stake. I am willing to do ANYTHING to
> remove my [s]on from the site of mistreatment at Marshfield. . . .
>
> No mother has persevered as I have, and my tenacity is not going to
> waver. . . .
>
> There is no mother on [E]arth as capable as I am, willing to devote every
> ounce of intelligence and compassion for her Son.

(Doc. 316-30 at 1, 2.)

A month later, Plaintiff Linda Luxenberg sent an email to seventeen people,
including reporters and at least seven federal and state officials. The subject of the email
read "Mother who Exposes the Cash Cow of the Agency agreement with DAIL
Commissioner in a 540,000 payment to UVS/Bill Ashe/Aris is GASLIT." In the body of
the email, Plaintiff Linda Luxenberg asserted:

> Assistant Attorney General Ben Chater has been asked to recuse himself
> from the ongoing Gaslighting "Sham," proven nearly five years ago[,] to
> cover up Systematic Failure in providing adult autism programming 24/7 at
> a Waitsfield home purchased by the Mother.
>
>                    * * *

> Gaslighting, Hate Crime, Sham, Scandal, Fraud; it all occurred as I
> continued in the Mother's role as Ardent Advocate. . . .
>
> My job is to clear up misinformation, one I continue to stand by in my Role
> and Responsibility clearly stated in Vermont's Guardianship manual and as
> required per Probate Court documentation.

(Doc. 316-1 at 24-25, ¶ 44b-d.)

On October 5, 2024, Plaintiff Linda Luxenberg contacted AAG Kenney via an email titled:

> Mother in Guardianship Brings to Light Humanitarian Issue of Abuse and
> Neglect of a Vulnerable Adult in Marshfield as DAIL supplies Funding to
> Agencies in Management (with [conflict of interest]) who respond in
> Bullying, Harassment[,] and Retaliation to Silence concerns of Vermont
> Systemic Failures in Violation of State and Federal Regulations Misusing
> Medicaid Funds.

*Id.* at 25, ¶ 45a. Therein, she stated that "CNN and CBS ha[d] been contacted by those concerned about 'real' issues." *Id.* at ¶ 45b.

On December 12, 2024, Plaintiff Linda Luxenberg contacted Vermont State Senator Lyons, Congresswoman Balint, and the Vermont State Treasurer's and Auditor's offices via email:

> I hereby request a bill to protect mothers in guardianship in Vermont
> against bullying, harassment[,] and retaliation as they speak on behalf of
> their loved ones who are victims of "CASH COW."
>
>                                                    * * *
>
> The mother has spoken out against misuse of funding to all authorities in
> hopes her voice receives appropriate response, rather than retaliatory.

(Doc. 316-33 at 1.)

LCMHS provides John Doe with communication supports, including "verbal/audio, writing, use of a calendar, scripting, whiteboards, iPad, and photos." (Doc. 313-1 at 20, ¶ 80.) LCMHS also supports John Doe's community engagement by arranging activities such as family hikes, grocery shopping, eating at restaurants, library visits, swimming, bowling, and car rides. The programming is driven by John Doe's choices and preferences. As of September 2024, John Doe was receiving speech language pathology services at the Stern Center in Williston, Vermont.

19

F.    **Plaintiff Linda Luxenberg's Removal as Guardian.**

On July 2, 2024, LCMHS filed a motion in the Probate Court to modify John Doe's guardianship, seeking "a) termination of [Plaintiff] Linda[] [Luxenberg's] powers of guardianship; b) appointment of [Mr. Luxenberg] as guardian of [John Doe] . . . and c) appointment of Kelcey [Luxenberg] as co-guardian with the limited power 'to obtain legal advice and to commence or defend against court actions in the name of the person under guardianship[.]'" Doc. 313-59 at 3. On July 23, 2024, LCMHS filed a motion for an expedited hearing because Plaintiff Linda Luxenberg scheduled John Doe for a surgical procedure but refused to sign a release for LCMHS to access his medical records.[8] The Probate Court held hearings on LCMHS's motion during the summer of 2024, and on November 20, 2024, the court terminated Plaintiff Linda Luxenberg and Kelcey Luxenberg as guardians and appointed Mr. Luxenberg.

The Probate Court's written opinion granting LCMHS's motion finds "[Plaintiff] Linda [Luxenberg] continues the harassing, disrupting, and intimidating behavior that gave rise to the court's June 6, 2022 decision[,]"[9] (Doc. 313-1 at 21, ¶ 83) (internal quotation marks omitted), wherein the court "declined to modify the guardianship of [John Doe] by adding [Plaintiff] Linda Luxenberg as [John Doe's] co-guardian[.]" (Doc. 313-59 at 2.) It also found that:

---

[8] DAIL filed a motion joining LCMHS's motion on July 24, 2024.

[9] As an example, the Probate Court relies on Plaintiff Linda Luxenberg's email wherein she writes: "Mary Ellen, Newly hired Katy [Kuchta] is sending you down a scandalous path; given your role and signatures as Case Manager regarding federal documents, you may want to consider diverting as a 'Whistleblower.'" (Doc. 316-1 at 20, ¶ 37b). The court also alludes to an email Plaintiff Linda Luxenberg sent to Ms. Kuchta on June 23, 2024:

> Your bullying behavior brings me back to my Kindergarten and Seventh Grade teaching days . . .
>
> I will be acting as "Bully Buster," taking serious action as bullying has no place on "Tman Team." If you cannot follow the rules, appreciative of the Team members acting on behalf of my [s]on (suffering at Marshfield and clearly expressing his desire to leave) you are not welcome to participate in the process of moving forward on his behalf.

*Id.* at 20-21, ¶ 37b.

> [T]he reasons for adding [Plaintiff] Linda [Luxenberg] as co-guardian on
> August 1, 2022[,] are no longer extant. There has been insufficient progress
> made toward moving John Doe to South Carolina. That lack of progress
> coupled with [Plaintiff] Linda[] [Luxenberg's] continued harassing,
> disrupting, and intimidating behavior toward LCMHS and its staff renders
> her unsuitable to continue to serve as John Doe's guardian. The long
> periods of time without visiting John Doe[] a[l]s[o] renders her unsuitable
> to continue to serve as John Doe's guardian. The court also takes [judicial]
> notice of [Plaintiff] Linda [Luxenberg's] substantiation for neglect of a
> vulnerable adult.

(Doc. 313-1 at 21, ¶ 83) (brackets and internal quotation marks omitted).

### G.    Plaintiffs' Expert Witnesses.

Plaintiffs retained Joseph Reichle, Ph.D., a Professor Emeritus in the Department
of Speech-Language-Hearing Sciences at the University of Minnesota, as an expert
witness in communication and language, specifically in augmentative communication and
positive behavioral support for persons with developmental disabilities and "complex
communication needs[.]" (Doc. 318-1 at 2, ¶ 2.)

It is Dr. Reichle's opinion that John Doe faces a "substantial risk of
institutionalization." *Id.* During his July 11, 2024 deposition, AAG Kenney asked Dr.
Reichle whether there is a definition for "a reasonable risk of institutionalization[]" in his
field of expertise. *Id.* at ¶ 4. Dr. Reichle explained:

> I believe so. And in [John] Doe's case, I guess it all depends on how you
> define institutionalization, but I could make the argument that when he's
> hospitalized for extended periods of time and not as a result of any injury
> that he suffered, I could argue that that's institutionalization.

*Id.* (emphasis omitted).

AAG Kenney asked Dr. Reichle whether "there [is] a commonly accepted
definition of . . . institutionalization, meaning boarding, in an [ED] in [his] profession[.]"
*Id.* at 3, ¶ 4. Dr. Reichle responded: "It's hard to answer that because . . . back in the day
when institutions were far more prevalent for persons with developmental disabilities,
often the medical part of the facility was housed in the same building as the institution, so
it becomes one huge gray area." *Id.* (emphasis omitted). Dr. Reichle later testified,
however, that there is no set definition for an "unreasonable risk of institutionalization" in

his profession, (Doc. 318-1 at 4, ¶ 6) (internal quotation marks omitted), nor have there been any studies performed to develop criteria to determine an adult's risk of institutionalization.

Dr. Reichle stated that "the criteria that would be applicable for a child in this circumstance who would possibly be expelled" may or may not "be applicable to a situation like [John] Doe's[] to determine whether or not he's at a greater or lesser risk of institutionalization[.]" *Id.* at ¶ 5. He conceded that the methodology that he used to formulate his opinions has not been "extensively researched or peer-reviewed," *id.*, and that he had not consulted with independent experts regarding his conclusions.

In rendering his opinions, Dr. Reichle recommends John Doe participate in certain programs, such as functional communication training, to decrease his risk of institutionalization. He is unable to point to any studies or analyses, however, that support that conclusion.

Plaintiffs also retained Danielle Kent, M.S., CCC-SLP, as an expert witness. Ms. Kent is an SLP with a master's degree in speech language pathology. She authored an expert report wherein she provides recommendations related to tools and programs to support John Doe's "expressive communication deficits and [to] enable him to initiate/advocate for the conditions of his existence." (Doc. 318-37 at 4.) In her expert report, however, Ms. Kent does not opine regarding whether John Doe is at risk of institutionalization or whether he is at risk of unreasonable isolation and does not identify programs that may be effective in addressing or reducing such risks.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict

22

for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

"When an adverse party does not respond to a motion for summary judgment, summary judgment should only be granted if appropriate." *Wieder v. Greater Hudson*

*Valley Sys.*, 2024 WL 5107625, at *5 (S.D.N.Y. Dec. 13, 2024) (citation omitted). "Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Barnett v. Diaz*, 2022 WL 1912246, at *3 (S.D.N.Y. June 2, 2022) (internal quotation marks omitted) (quoting *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 242 (2d Cir. 2004)).

**B.    Claims Asserted on John Doe's Behalf.**

By virtue of the removal of Plaintiff Linda Luxenberg and Kelcey Luxenberg as John Doe's guardians, two plaintiffs remain in this case: Mr. Luxenberg, as guardian and father of John Doe, and Plaintiff Linda Luxenberg in her individual capacity. Mr. Luxenberg does not oppose summary judgment in Defendants' favor. Plaintiff Linda Luxenberg has not filed an opposition to summary judgment.

"Article III limits the federal judicial power to deciding Cases and Controversies. Under Article III, a case or controversy can exist only if a plaintiff has standing to sue, meaning a personal stake in the outcome of the litigation." *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 45 (2d Cir. 2023) (internal citations and quotation marks omitted) (quoting U.S. Const. art. III § 2; *United States v. Texas*, 599 U.S. 670, 675 (2023)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

"Typically, a plaintiff will have standing only to 'assert his or her own legal rights and interests' and may not 'rest a claim to relief on the legal rights or interests' of others." *Doe v. Hochul*, 139 F.4th 165, 177 (2d Cir. 2025) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). The Second Circuit, however, has recognized narrow exceptions in which a plaintiff may rely on a third party's injuries to establish standing:

> Most relevant here, courts have exercised the authority to appoint a "next friend" who may bring claims on behalf of a minor or other incompetent person. *See Whitmore v. Arkansas*, 495 U.S. 149, 161-62 (1990). Because these parties lack the legal capacity to sue, the only way to vindicate their

24

rights is to permit another to prosecute their claims in a representative capacity. Normally, that duty would fall on the minor or incompetent party's legal guardian.

*Id.*

Pursuant to Fed. R. Civ. P. 17(c):

The following representatives may sue or defend on behalf of a minor or an incompetent person: (A) a general guardian; (B) a committee; (C) a conservator; or (D) a like fiduciary. . . . A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."

As a result of the Probate Court's November 20, 2024 decision, Mr. Luxenberg was "appointed as the sole guardian of [John Doe] with plenary powers under 14 V.S.A. § 3069(c)(1)-(6)." (Doc. 313-59 at 7.) Under 14 V.S.A. § 3069(c)(6), a legal guardian has "[t]he power to obtain legal advice and to commence or defend against court actions in the name of the person under guardianship."

In accordance with Supreme Court precedent, to establish "next friend" standing, "[f]irst, a 'next friend' must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his [or her] own behalf to prosecute the action." *Hochul*, 139 F.4th at177 (internal quotation marks omitted) (quoting *Whitmore*, 495 U.S. at 163). "Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he [or she] seeks to litigate." *Id.* (quoting *Whitmore*, 495 U.S. at 163.) Based on the Probate Court's November 20, 2024 decision and the undisputed facts, Mr. Luxenberg satisfies both requirements. Accordingly, only Mr. Luxenberg has standing to assert claims on John Doe's behalf.

In his response to Defendants' summary judgment motions, Mr. Luxenberg stated he "does not oppose the [c]ourt granting Defendants' [s]ummary [j]udgment on all counts." (Docs. 336 at 3; 337 at 3.) The court therefore deems Mr. Luxenberg's claims on behalf of John Doe abandoned. *See Curry v. Keefe*, 2021 WL 1087444, at *6 (D. Vt. Mar. 22, 2021) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one claim and the party opposing summary judgment fails to

25

address the argument in any way.") (internal quotation marks omitted) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

For this reason, the court GRANTS Defendants' motions for summary judgment on all claims on behalf of John Doe. *See id.* ("Where appropriate, a grant of summary judgment should 'include a finding of abandonment of undefended claims or defenses.'") (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)).

### C.    Plaintiff Linda Luxenberg's Claims on Her Own Behalf.

Plaintiff Linda Luxenberg may not rely on "next friend" standing due to the Probate Court's termination of her guardianship of John Doe. She therefore has standing only to bring claims arising out of "her own legal rights and interests[.]" *Hochul*, 139 F.4th at 177 (internal quotation marks omitted) (quoting *Powers*, 499 U.S. at 410).

On November 26, 2024, without opposition, the court dismissed Plaintiff Linda Luxenberg's personal injury and emotional distress claims (the "November 26 Order"). In doing so, the court explained that "[i]n light of Plaintiff Linda Luxenberg's lack of compliance with this court's Orders and her statements that she is willing to abandon her claims to personal injury and emotional distress damages, the court finds that dismissal of those claims is proper." (Doc. 296 at 5.) Regarding her First Amendment claim, however, the court determined that if "Plaintiff Linda Luxenberg establishes a violation of the United States Constitution, she may pursue an award of nominal damages[.]" *Id.* at 6 (citation omitted). Therefore, only her First Amendment Claim (Count XIV) remains.

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Government action that suppresses speech because of its message contravenes this essential right." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 66-67 (2025) (internal citation and quotation marks omitted) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).

26

1.    **Whether Plaintiff Linda Luxenberg Has Established State Action.**

The TAC alleges Commissioner White, WCMHS, and Ms. Moulton infringed on Plaintiff Linda Luxenberg's free speech rights by initiating a "legal campaign to terminate [her] guardianship of [John] Doe in response to [Plaintiff Linda Luxenberg's] [] advocacy on his behalf[.]" (Doc. 259 at 90, ¶ 533.) "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)). "A state employee acting in his [or her] official capacity is acting under color of state law." *Id.* (internal quotation marks omitted) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015)).

In an October 13, 2023 Opinion and Order, the court granted the DAIL Defendants' motion to dismiss Plaintiffs' First Amendment claim "on Eleventh Amendment grounds to the extent it allege[d] an official capacity claim against Commissioner White for monetary damages." The court denied the motion insofar as "Plaintiffs assert[ed] an individual capacity claim for monetary damages and an official capacity claim for prospective injunctive relief." (Doc. 196 at 22-23.) Plaintiff Linda Luxenberg's remaining claim therefore alleges a First Amendment claim against Commissioner White, a state actor, in her individual capacity.

Ms. Moulton is the Executive Director of WCMHS, which "is a non-profit organization in Vermont" that acts as a Designated Agency "providing services to people in Washington County with disabilities." (Doc. 259 at 3, ¶ 13.) WCMHS is not a state agency, and Ms. Moulton is not a state employee. Entities like WCMHS, however, may be state actors if they are "not simply regulated by the State; rather, they are deeply integrated into the regulatory scheme . . . , the implementing regulations, and the administrative directive." *Catanzano by Catanzano v. Dowling*, 60 F.3d 113, 119 (2d Cir.

27

1995) (finding certified home health agencies, regulated by state and federal regulations, were state actors in light of their close relationship to the State Department of Health).

In this case, Plaintiffs conceded that as a designated agency, WCMHS is bound by 18 V.S.A. § 8907[10] and that it "must provide . . . supports and services consistent with available funding; the state and local System of Care Plans; outcome requirements; and state and federal regulations, policies[,] and guidelines." *Service Providers*, Developmental Disabilities Servs. Div., https://ddsd.vermont.gov/services-providers/providers (last visited July 15, 2025).[11] It is thus "deeply integrated" in a regulatory scheme devised to carry out the State of Vermont's obligations to certain vulnerable individuals. For this reason, in the light most favorable to Plaintiff Linda Luxenberg, WCMHS and Ms. Moulton as its employee are state actors.

## 2. Whether Plaintiff Linda Luxenberg Has Established the Elements of a First Amendment Retaliation Claim.

"First Amendment retaliation claims typically arise in three distinct contexts: prisoners, public employees, and criticism of public officials[.]" *Decker Advert. Inc. v. Del. Cnty., N.Y.*, 765 F. Supp. 3d 128, 141 (N.D.N.Y. 2025) (citation omitted). A private citizen alleging a claim against a public employee or official must show: "(1) the plaintiff has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his [or her] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [plaintiff's] First Amendment right[.]" *Williams v.*

---

[10] "[T]he Commissioners of Mental Health and of Disabilities, Aging, and Independent Living shall, within the limits of funds designated by the General Assembly for this purpose, ensure that community services to persons with a mental condition or psychiatric disability and persons with a developmental disability throughout the State are provided through designated community mental health agencies. The Commissioners shall designate public or private nonprofit agencies to provide or arrange for the provision of these services." 18 V.S.A. § 8907(a).

[11] "A court may properly take judicial notice of a document when the document is publicly available and its accuracy cannot reasonably be questioned." *Picket Fence Preview, Inc. v. Zillow, Inc.*, 623 F. Supp. 3d 371, 380 (D. Vt. 2022) (quoting *Apotex Inc v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016)) (citing Fed. R. Evid. 201(b)) (internal quotation marks and alterations omitted). "A court may take routine judicial notice of documents retrieved from official government websites." *Vill. Green At Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022) (internal quotation marks, alterations, and citations omitted).

*Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (brackets and internal quotation marks omitted) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).

Plaintiff Linda Luxenberg has an interest protected by the First Amendment because "speech regarding 'matters of public concern' lies 'at the heart of the First Amendment's protection.'" *DoorDash, Inc. v. City of New York*, 750 F. Supp. 3d 285, 300 (S.D.N.Y. 2024) (quoting *Fist Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotation marks omitted) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Plaintiff Linda Luxenberg's speech relates to alleged misconduct by state actors carrying out the State's responsibilities with regard to disabled individuals. She claims that when she raised her concerns, the state actors retaliated against her by seeking her removal as John Doe's guardian. Her speech on a matter of public concern is subject to First Amendment protections. *See Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) ("Exposing governmental inefficiency and misconduct is a matter of considerable significance.").

Turning to the second element of Plaintiff Linda Luxenberg's First Amendment retaliation claim, her claim is based on the alleged attempts of Commissioner White, WCMHS, and Ms. Moulton to terminate her guardianship of John Doe because of her protected speech. In effect, she alleges her speech was the but-for cause of this action.

It is undisputed that Commissioner White became involved in John Doe's guardianship litigation to ensure John Doe's well-being. *See, e.g.*, Doc. 316-1 at 6, ¶ 9 (stating "[John Doe] would be negatively impacted if [Plaintiff Linda Luxenberg] were appointed guardian[]"). On October 17, 2022, Commissioner White filed an emergency motion to modify John Doe's guardianship order wherein she stated Plaintiff Linda Luxenberg failed to administer John Doe's medications during one of his stays with her. Five weeks later, on November 23, 2022, WCMHS and Commissioner White filed a joint motion for an order modifying John Doe's guardianship order, alleging "[Plaintiff] Linda

Luxenberg had continued to force [John] Doe to be transported to hospital [EDs], against his best interests and without any evidence of any medical emergency[,]" and that her "unreasonable and inappropriate conduct compelled [John] Doe's [PCP]" to terminate its relationship with John Doe. *Id.* at 16, ¶ 29a, b. Nothing in the record supports a conclusion that Commissioner White, WCMHS, or Ms. Moulton sought Plaintiff Linda Luxenberg's removal as John Doe's guardian to retaliate against her for her protected speech.

Even if Plaintiff Linda Luxenberg could establish Defendants were motivated by her exercise of her First Amendment rights, Plaintiff Linda Luxenberg must still establish that Defendants' actions chilled her exercise of these rights. During the pendency of the Probate Court litigation and thereafter, Plaintiff Linda Luxenberg sent emails to various state and federal officials wherein she made statements such as: "My voice is strong, healthy[,] and will not be stifled through deceitful actions[,]" (Doc. 317-1 at 22, ¶ 40e) (internal quotation marks omitted); "In my role as Guardian of my [s]on as a vulnerable adult[,] I will forever Speak out Proudly on his Behalf," *id.* at 23, ¶ 41b (internal quotation marks omitted); and "Most of my victories have been accomplished Pro Se, where I stand proudly today exercising my right to the [F]irst [A]mendment valuing Free Speech." *Id.* at ¶ 42a (internal quotation marks omitted). Plaintiff Linda Luxenberg further voiced her criticism of Vermont's health care system for persons with disabilities in an online article published by VTDigger.

After her guardianship was terminated, Plaintiff Linda Luxenberg sent an email to a number of state officials and news outlets requesting "a bill to protect mothers in guardianship in Vermont against bullying, harassment[,] and retaliation as they speak on behalf of their loved ones who are victims of 'CASH COW.'" *Id.* at 26, ¶ 46a (internal quotation marks omitted). Even in the light most favorable to Plaintiff Linda Luxenberg, there is no evidence that her protected speech was in fact chilled. Accordingly, she has failed to establish the third essential element of her First Amendment retaliation claim. *See Celotex Corp.*, 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a

matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

For these reasons, the court GRANTS Defendants' motions for summary judgment on Plaintiff Linda Luxenberg's First Amendment claim.

## CONCLUSION

For the foregoing reasons, the court GRANTS the motion for summary judgment filed by Defendants WCMHS, Ms. Moulton, and LCMH, (Doc. 313), and GRANTS the motions for summary judgment filed by the DAIL Defendants. (Docs. 316, 317, 318.) SO ORDERED.

Dated at Burlington, in the District of Vermont, this _18th_ day of July, 2025.

Christina Reiss, Chief Judge
United States District Court